UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ALEXANDER G. BALDWIN, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Docket No. _____ |
| ) | |
| JOHN W. BADER, STEVEN P. BOULET, ) | |
| MICHAEL L. BROUSSEAU, SCOTT F. ) | |
| HALL, ROGER H. POULIN, and JOHN A. ) | |
| POWELL, ) | |
| ) | |
| Defendants ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**PARTIES**

1.  Plaintiff Alexander G. Baldwin ("Baldwin" or "Plaintiff") is an individual residing in Oak Ridge, Tennessee. Baldwin owns fifty (50) common shares of the stock of WahlcoMetroflex, Inc. ("WMI"). WMI is a Delaware Corporation with its principal place of business in Lewiston, Maine.

2.  Defendant John W. Bader ("Bader") is an individual residing in Boston, Massachusetts. At all relevant times, Bader was a WMI shareholder and member of the WMI board of directors.

3.  Defendant Steven P. Boulet ("Boulet") is an individual residing in Greene, Maine. At all relevant times, Boulet was a WMI shareholder and member of the WMI board of directors.

4. Defendant Michael L. Brousseau ("Brousseau") is an individual residing in Greene, Maine. At all relevant times, Brousseau was a WMI shareholder and member of the WMI board of directors.

5. Defendant Scott F. Hall ("Hall") is an individual residing in Windham, Maine. At all relevant times, Hall was a WMI shareholder and member of the WMI board of directors.

6. Defendant Roger H. Poulin ("Poulin") is an individual residing in Lewiston, Maine. At all relevant times, Poulin was a WMI shareholder and member of the WMI board of directors.

7. Defendant John A. Powell ("Powell") is an individual residing in Cumberland, Maine. At all relevant times, Powell was a WMI shareholder and member of the WMI board of directors.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000.

9. Venue is proper pursuant to 28 U.S.C. § 1391(a).

## FACTS COMMON TO ALL COUNTS

### WMI Is Formed In June of 2000

10. WMI was incorporated as a Delaware Corporation on June 19, 2000, under the name WEP Acquisition, Inc. for the purposes of attempting to acquire the assets of Wahlco Engineered Products (WEP), a subsidury of Thermatrix, Inc. then in bankruptcy. On January 8, 2001, WMI became authorized to do business in Maine.

Effective as of February 28, 2001, in Delaware, and March 21, 2001, in Maine, WMI officially changed its name from WEP Acquisition, Inc. to WahlcoMetroflex, Inc.

11. On or about January 17, 2001, under the name WEP Acquisition, Inc., WMI acquired certain of the assets of four entities, Wahlco Engineered Products, Inc., Bachman Companies, Inc., Wahlco, Inc., and Wahlco Environmental Systems, Inc. (collectively, the "Predecessor Entities").

12. From its inception, WMI was engaged in the business of designing, manufacturing, installing and servicing a broad range of high-performance isolation and flow control dampers, expansion joints, related duct systems and other industrial systems. It continues to be engaged in that business today.

13. Pursuant to its original articles of incorporation, WMI was authorized to issue up to 1,000 shares of common stock.

14. Immediately following its incorporation, and on or about December 28, 2000, WMI issued each of the Defendants 50 shares of WMI common stock each in return for individual capital contributions of approximately $15,000.

15. Defendant Bader was appointed the sole director of WMI following its incorporation.

16. In January of 2001, WMI issued 50 chares of common stock to Baldwin in return for a payment of $ 15,000.

17. On or about January 16, 2001, Baldwin was appointed vice-president of WMI.

18. On or about January 25, 2001, Baldwin was appointed a director of WMI, as well as the corporation's president and chief executive officer. Baldwin was later also appointed to the board of directors of WMI's India-based affiliate, Bachmann India.

### WMI Borrows Funds from Wells Fargo and Others

19. On or about January 17, 2001, WMI borrowed approximately $3,750,000.00 (the "Wells Fargo Indebtedness") from Wells Fargo Business Credit, Inc. ("Wells Fargo"). In addition, WMI, in early 2001, WMI borrowed substantial additional funds from the Finance Authority of Maine ("FAME"), the Androscoggin Valley Council of Governments ("AVCOG") and Coastal Enterprises, Inc. ("CEI"). These funds were used to, *inter alia,* fund the purchase of WMI's assets from the Predecessor Entities and to provide operating capital for WMI's operations.

20. Baldwin and all of the Defendants personally guaranteed the Wells Fargo Indebtedness, as well as, upon information and belief, the loans from FAME, AVCOG and CEI.

21. Neither Baldwin nor Defendants were granted any compensation, whether in cash, property or additional common stock of WMI, in consideration of their providing personal Guaranties of the Wells Fargo Indebtedness and other indebtedness.

22. In November of 2002, the shareholders of WMI (Baldwin and Defendants) voted to increase the size of the corporation's board of directors (the "Board") such that Baldwin and all Defendants would thenceforth serve as directors of the corporation.

### Baldwin Resigns his Positions with WMI and It's Affiliate

23. In April of 2004, Baldwin resigned his positions as an officer and director of WMI and a director of an affiliate of WMI, Bachman India, in order to engage in other

pursuits. Notwithstanding his resignation as officer and director, he retained his ownership of the 50 shares of common stock of WMI.

24.     Following Baldwin's resignation, the Board was comprised of the six Defendants. The six Defendants have served as the Directors of WMI since that time and through the present date.

### Defendants Begin Discussing the Possibility of Issuing "Guaranty Shares"

25.     In late 2004, the officers and directors of WMI began discussing the possibility of establishing a financing relationship with Androscoggin Savings Bank ("Androscoggin"). This relationship would replace the pre-existing lending relationship with Wells Fargo.

26.     At a meeting of the Board of Directors of WMI held on March 9, 2005, Defendants (in their capacities as WMI's directors) discussed the possibility of borrowing approximately $205,000.00 from AVCOG to fund the production of a large customer order (the "AVCOG Loan"). As part of that proposed transaction, AVCOG requested that WMI's shareholders provide personal guaranties for the AVCOG Loan.

27.     In return for providing guaranties for the AVCOG Loan, Defendants proposed that each participating shareholder (*i.e.*, each shareholder that guarantied the prospective loan) would be issued additional WMI common stock ("Guaranty Shares") in return for those guaranties.

28.     More specifically, at the March 9, 2005 Board Meeting, the Board, then consisting entirely of the Defendants, voted that "the Guarantee [sic] Shares for each $100,000 of additional personal guaranties should equal, in the aggregate, approximately five percent (5%) (rounded up to prevent issuing partial shares) of the outstanding equity

of [WMI] on a fully diluted basis". This formula for issuance of common shares in consideration of guarantying corporate indebtedness of WMI shall be referred to as the "March 9 Guaranty Shares Formula". On the same date, the Board voted that "the Guarantee Shares with respect to the [proposed AVCOG Loan] shall equal forty-two (42) shares of the common stock."

29. After being notified of the Board's decision, Baldwin declined to guaranty the proposed AVCOG Loan.

30. During the Board's discussions of the AVCOG Loan and the issuance of the guaranty Shares, the Board acknowledged that this course of action could raise "potential dilution issues," because it was proposed that WMI issue the Guaranty Shares from authorized but then unissued shares of common stock.

31. Although WMI eventually consummated the AVCOG Loan, WMI never issued Guaranty Shares to the director/shareholders who guarantied the same.

### Defendants Vote to Borrow Funds from Androscoggin, Issue Themselves Guaranty Shares, and Dilute Baldwin's Ownership Interest.

32. In August of 2005, the Defendants (in their capacities as WMI's directors) unanimously consented to borrow approximately $3,627,500 from Androscoggin in the form of a line of credit and multiple term loans (collectively, the "Androscoggin Loan"). These funds would be used, in part, to pay off and satisfy the Wells Fargo Indebtedness.

33. As a condition of making the Androscoggin Loan, Androscoggin required that WMI's shareholders personally guaranty the Loan. Defendants, constituting all of the Directors of WMI, voted to authorize the Androscoggin Loan and voted to issue to themselves Guaranty Shares using the March 9 Guaranty Shares Formula.

34. In order to ensure there was a sufficient pool of authorized, but unissued common stock to issue themselves the Guaranty Shares, the Defendants, in their capacities as the Directors of WMI and as six of the seven owners of WMI (Baldwin being the seventh), voted to amend WMI's articles of incorporation such that it was authorized to issue to up to 2,000 shares of common stock in total.

35. Based upon the March 9 Guaranty Shares Formula that the Defendants, as members of the Board of WMI had previously established, the Defendants agreed to Guaranty the Androscoggin Loan. Baldwin, no longer active in the business of WMI, declined to do so.

36. On or about July 15, 2005, the Androscoggin Loan was made, and Defendants provided personal Guaranties of the same.

37. WMI used the funds provided by Androscoggin to, *inter alia*, satisfy the Wells Fargo Indebtedness in full, thereby canceling Baldwin's and Defendants' guaranties of the same.

38. On January 1, 2006, Defendants, as members of the Board of Directors of WMI, caused WMI to issue to each of them 107 shares of the common stock of WMI pursuant to the authorization for the same that the Defendants, as directors of WMI had voted, and pursuant to the March 9 Guaranty Shares Formula. The issuance of theses shares was in return for their personal guaranties of the Androscoggin Loan.

39. In total, 642 shares of common stock were issued to Defendants in consideration of their providing guaranties of the Androscoggin Loan.

40. As a result of the issuance of the Guaranty Shares, Baldwin's 14.3% ownership interest in WMI common stock was diluted to a 5 % ownership interest.

41. At a May 15, 2006 WMI shareholders' meeting, the decision to issue the Guaranty Shares was unanimously ratified by Defendants in their capacities as WMI shareholders. Baldwin did not cast a vote ratifying the issuance of the Guaranty shares; in fact, Baldwin was not present at the shareholders' meeting at the time that the vote was taken.

42. In late 2006, Defendants, in their capacity as WMI's directors, voted unanimously to increase by $1,000,000 WMI's revolving line of credit with Androscoggin (the "2006 LOC Increase").

43. In consideration of the 2006 LOC Increase, Androscoggin requested that WMI's shareholders guaranty the same.

44. In late 2006, the Defendants again voted, in their capacity as WMI's directors, to issue to themselves still more Guaranty Shares (the "Additional Guaranty Shares") in relation to their expected guaranties of the 2006 LOC Increase.

45. Upon information and belief, on or about January 18, 2007, the 2006 LOC Increase closed, and the Additional Guaranty Shares were issued pursuant to the March 9 Guaranty Shares Formula.

46. Baldwin did not agree to Guaranty the 2006 LOC Increase and was awarded no Additional Guaranty Shares.

47. As a result of the issuance of the Additional Guaranty Shares in January of 2007, Baldwin's ownership interest in common stock of WMI was diluted again, this time from a 5% ownership interest to approximately a 3% ownership interest.

**COUNT I - Breach of Fiduciary Duty**

48. Baldwin restates and realleges the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

49. At all relevant times, the Defendants were the majority shareholders and all of the directors of WMI. In their latter capacity, Defendants controlled the actions of the Board.

50. As such, Defendants owed and continue to owe certain obligations, duties, and responsibilities to, *inter alia*, WMI's only other common shareholder - Baldwin. These obligations, duties and responsibilities include, but are not limited to, the obligation to exercise their powers and discharge their duties in good faith and with a view to the interests of WMI's shareholders (including Baldwin), and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions.

51. In situations such as this, where Defendants have personal interests in the transactions at issue (*i.e.*, the issuance of Guaranty Shares and Additional Guaranty Shares to themselves), they are required to demonstrate the utmost good faith when evaluating the transactions and they have the burden of demonstrating the entire fairness of the same.

52. Defendants' self-dealing in issuing themselves the Guaranty Shares and the Additional Guaranty Shares, thereby diluting Baldwin's ownership interest in WMI, constituted a breach of their fiduciary duties, because the issuance of the Guaranty Shares and the Additional Guaranty Shares was unreasonable, unfair, unjust, and not done in good faith.

53. The issuance of the Guaranty Shares and the Additional Guaranty Shares is null and void, because such shares have been issued in violation of the fiduciary duties of the Defendants as Directors of WMI.

54. Alternatively, as a direct and proximate result of Defendants' breach of their fiduciary duties, the value of Baldwin's common stock interest in WMI has declined substantially, and Baldwin has been damaged thereby, in an amount, to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alexander G. Baldwin, respectfully requests the following relief: That the Court enter an order (a) determining and declaring that the issuance of the Guaranty Shares and the Additional Guaranty Shares is null and void; (b) granting judgment in favor of Plaintiff and against Defendants, jointly and severally, for the full amount of Plaintiff's damages, to be proven at trial; and (c) granting such other and further relief as the Court deems just and proper.

**Plaintiff demands a trial by jury.**

Dated: March 23, 2007                /s/ George J. Marcus
                                     George J. Marcus, Esq.
                                     David C. Johnson, Esq.

                                     Attorneys for Plaintiff Alexander G. Baldwin

                                     MARCUS, CLEGG & MISTRETTA, P.A.
                                     100 Middle Street, East Tower
                                     Portland, ME  04101
                                     (207) 828-8000

S:\B\Baldwin, Alex\Pleadings\07.03.23.Baldwin Complaint.final.doc