### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| *ALEXANDER G. BALDWIN,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 07-46-P-H* |
| | ) | |
| *JOHN W. BADER, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

### MEMORANDUM DECISION ON MOTION TO EXCLUDE
### AND RECOMMENDED DECISION ON
### CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Alexander G. Baldwin, a minority shareholder of WahlcoMetroflex, Inc. ("WMI"), seeks summary judgment as to both liability and damages with respect to his claim that defendants John W. Bader, Steven P. Boulet, Michael L. Brousseau, Scott F. Hall, Roger H. Poulin, and John A. Powell, WMI shareholders and directors, breached their fiduciary duties to him in voting to issue two tranches of shares, diluting his ownership interest in WMI. *See* Plaintiff's Motion for Summary Judgment on Liability and Damages, etc. ("Plaintiff's Motion") (Docket No. 27) at 1-2, 30; *see also generally* Complaint and Demand for Jury Trial ("Complaint") (Docket No. 1). The defendants cross-move for partial summary judgment with respect to the plaintiff's claim insofar as it concerns the first of the two contested share issuances. *See* Defendants' Motion for Partial Summary Judgment, etc. ("Defendants' Motion") (Docket No. 29) at 1-3 & n.2. For the reasons that follow, I recommend that the court grant the Defendants' Motion, grant the Plaintiff's Motion insofar as it concerns liability for issuance of the second tranche of shares, and otherwise deny the Plaintiff's Motion. With the benefit of an evidentiary hearing and oral argument held before me on May 28,

2008, I also grant a motion by the plaintiff to exclude testimony of the defendants' expert, John T. Gurley, insofar as it concerns Gurley's valuation of personal guaranties of WMI's debt given by the defendants in 2005 and 2007.  *See* Motion To Exclude Testimony of Defendants' Valuation Expert, John T. Gurley[,] and [for] Related Relief ("Motion To Exclude") (Docket No. 31) at 1.

## I.  Motion To Exclude

### A.  Background

This is the court's second look at the Motion To Exclude.  Previously, the plaintiff moved to challenge several of Gurley's opinions, including that concerning the value of the defendants' personal guaranties, on grounds that they were unequivocally erroneous and/or unreliable and therefore inadmissible pursuant to *Daubert v. Merrell Dow Pharms., Inc*, 509 U.S. 579 (1993), *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999), and Federal Rule of Evidence 702.  *See id.* at 1, 4-5.  On March 24, 2008, my predecessor, Magistrate Judge Cohen, issued a decision granting the Motion To Exclude insofar as it concerned Gurley's valuation of personal guaranties and denying it insofar as it concerned his other challenged testimony.  *See generally* Memorandum Decision on Motion To Exclude ("Exclusion Decision") (Docket No. 58).  The defendants objected to the partial exclusion of Gurley's testimony on grounds, *inter alia*, that Judge Cohen had accepted and relied on inaccurate factual assertions raised in the plaintiff's reply memorandum and in an affidavit of his expert, Mark G. Filler, to which Local Rule 7 had afforded them no opportunity to respond.  *See* Defendants' Partial Objection to Recommended Decision on Motion To Exclude Testimony of Defendants' Valuation Expert, John T. Gurley ("Exclusion Decision/Objection") (Docket No. 59) at 1-3.  Judge Hornby vacated the portion of the decision to which objection was made and remanded it to me for rehearing and reconsideration, leaving it up to me to determine what kind of hearing, if any, was necessary.  *See* Order (Docket No. 64).  He observed that he felt it prudent to do so

"[b]ecause there are issues concerning new matter being raised in a Reply without opportunity for opposing counsel to respond, and an error in the ECF system that permitted excessive time for a filing, and because this matter is related to the pending motion for summary judgment before Judge Rich, Judge Cohen having retired[.]" *Id.*

On May 28, 2008, I held an evidentiary hearing at which both Gurley and the plaintiff's accounting expert, Mark G. Filler, testified, and both sides introduced exhibits. At the close of the hearing, counsel for both sides argued orally. I reserved ruling with respect to the admission of one exhibit to which the plaintiff lodged an objection, Defendants' Exh. 20, an excerpt from Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* (3d ed. 2008) ("*Cost of Capital III*"), and directed counsel to brief the question of its admissibility. The plaintiff argues against admission of Defendants' Exh. 20 on grounds that it is not probative of any matter in issue and was not relied upon by Gurley in forming his valuation opinion. *See generally* Plaintiff's Brief in Support of His Objection to the Admission Into Evidence of Defendants' Exhibit 20 From the Hearing on Plaintiff's Motion To Exclude Certain Testimony of John T. Gurley ("Exhibit 20 Brief") (Docket No. 73). The defendants counter that Gurley need not have relied on Defendants' Exh. 20 for it to be admissible at a *Daubert* hearing and that the exhibit is indeed probative of matters in issue, including matters placed in issue by the plaintiff. *See generally* Defendants' Response to Plaintiff's Brief in Support of His Objection to the Admission of Defendants' Exhibit 20 From the Hearing on Plaintiff's Motion To Exclude Certain Testimony of John T. Gurley ("Exhibit 20 Response") (Docket No. 74).

The plaintiff's objection to admission of Defendants' Exh. 20 is overruled. The exhibit is probative, at the least, of a matter placed in issue by the plaintiff: whether author Shannon P. Pratt subscribed to the view that there was no published study quantifying the risk premium added by

provision of a personal guaranty.  *Compare* Reply of Plaintiff to Defendants' Opposition to Motion To Exclude Testimony of Defendants' Valuation Expert, John T. Gurley, and [for] Related Relief ("Exclude Reply") (Docket No. 47) at 7 n.6; Excerpt from Shannon P. Pratt, *Cost of Capital: Estimation and Applications* (2d ed. 2002) ("*Cost of Capital II*"), Exh. D thereto, at 41; Plaintiff's Reply to Defendants' Partial Objection to Recommended Decision on Motion To Exclude Testimony of Defendants' Valuation Expert John T. Gurley ("Exclusion Decision/Obj. Response") (Docket No. 61) at 6 & n.2 *with* Defendants' Motion for Leave To File a Reply in Support of Their Objection to the Magistrate Judge's Decision on the Motion To Exclude the Testimony of Defendants' Valuation Expert John T. Gurley ("Motion for Leave To File") (Docket No. 62) at 2-3; *Cost of Capital III* at 57.

The defendants concede that Gurley did not rely on *Cost of Capital III* in formulating his valuation opinion.  *See* Exhibit 20 Response at 4.  However, that does not foreclose its admission for purposes of the instant *Daubert* hearing.  In the first instance, the plaintiff opened the door to citation of *Cost of Capital III* by citing *Cost of Capital II* for the proposition that Pratt subscribed to the view that there was no published study quantifying the risk premium added by provision of a personal guaranty.  *See* Exclude Reply at 7 n.6; Exclusion Decision/Obj. Response at 6 & n.2.

In any event, none of the authorities that the plaintiff cites, including Federal Rule of Civil Procedure 26, can fairly be read to stand for the proposition that a proponent of expert testimony is confined to defending against a *Daubert* challenge solely on the basis of authorities the expert used to formulate his or her opinion.  While, as the plaintiff notes, *see* Exhibit 20 Brief at 5-6, Rule 26(a)(2)(B) requires a proponent of expert testimony to proffer "a complete statement of all opinions the [expert] witness will express and the basis and reasons for them[,]" as well as "the data and other information considered by the [expert] witness in forming them[,]" it also mandates disclosure of

"any exhibits that will be used to summarize or support them[,]" Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii).

The caselaw the plaintiff cites, *see* Exhibit 20 Brief at 6-7, is either inapposite or turns on factors

other than the fact of the expert's non-reliance on the authority in question, *see In re Baycol Prods.*

*Litig.*, 495 F. Supp.2d 977, 996 (D. Minn.), *amended on other grounds*, 532 F. Supp.2d 1029 (D.

Minn. 2007) (rejecting characterization of articles post-dating expert's report as supportive of his

conclusions when he did not rely on them and they did not conclude, as he had, that Baycol caused

permanent myopathy); *In re Thoratec Corp. Sec. Litig.*, No. C-04-03168 RMW, 2006 U.S. Dist.

LEXIS 30602, at *27 (N.D. Cal. May 11, 2006) (holding that plaintiff failed to plead fraud with

particularity when, *inter alia*, his citation to an expert report postdating defendants' issuance of

market-size projections did not establish that defendants knew their projections were false);

*Datamize, LLC v. Plumtree Software, Inc.*, No C 02-5693 VRW, 2004 U.S. Dist. LEXIS 28382, at

*25-*26 (N.D. Cal. July 9, 2004), *aff'd*, 417 F.3d 1342 (Fed. Cir. 2005) (finding expert's testimony

to be of little probative value when, *inter alia*, he relied on an article published several years after

the patent application was filed, although a patent claim must be judged by standards existing as of

date claim filed); *Aid for Women v. Foulston*, Case No. 03-1353-JTM, 2005 U.S. Dist. LEXIS

45617, at *17 (D. Kan. July 14, 2005) (barring defendants from supplementing expert reports with

exhibits published after those reports were filed "because [the exhibits] change[d] the very nature of

the testimony of Defendants' experts").

By contrast, my own research indicates that, at least in some circumstances, it is permissible

for proponents of expert testimony to rely on authorities other than those explicitly relied on by the

expert to establish the reliability of the expert's methodology. *See, e.g., McCoy v. Whirlpool Corp.*,

214 F.R.D. 646, 652 (D. Kan. 2003) ("It bears emphasizing that plaintiffs have cited no legal

authority for the proposition that expert disclosures – standing alone – must meet and exceed all

possible lines of attack under *Daubert*.   Indeed, while Rule 26(a)(2)(B) requires a complete statement of all opinions to be expressed and the basis and reasons therefor, along with the data or other information considered by the witness in forming the opinions, it does not require that a report recite each minute fact or piece of scientific information that might be elicited on direct examination to establish the admissibility of the expert opinion under *Daubert*.   Nor does it require the expert to anticipate every criticism and articulate every nano-detail that might be involved in defending the opinion on cross-examination at a *Daubert* hearing."); *Astra Aktiebolag v. Andrx Pharm., Inc*., No. 99 CIV. 8926 (BSJ), 99 CIV. 9887 (BSJ), M-21-81, 1291, 2002 WL 193153, at *6 n.8 (S.D.N.Y. Feb. 6, 2002) (noting that court had permitted five new documents into evidence for "the very limited purpose of showing that the techniques used were generally recognized in peer review articles") (citation and internal quotation marks omitted); *Robert Billet Promotions, Inc. v. IMI Cornelius, Inc*., No. CIV. A. 95-1376, 1998 WL 721081, at *7-*8 (E.D. Pa. Oct. 14, 1998) (court did not err in permitting expert to testify at *Daubert* hearing that previously undisclosed treatise supported manner in which expert's damage assessment was made; prejudice, if any, was minimal when opponents had sufficient time to consult treatise and effectively cross-examine expert regarding it at *Daubert* hearing).

The plaintiff finally complains that injection of *Cost of Capital III* into the fray at the eleventh hour prejudiced him, and was patently unfair, inasmuch as it deprived him of the opportunity to depose Gurley about its applicability to his purported methodology.   *See* Exhibit 20 Brief at 6.   While the timing of the disclosure did indeed deprive the plaintiff of the opportunity to depose Gurley regarding the treatise, I discern no prejudice.   The cited portions of *Cost of Capital III*, by the plaintiff's own admission, are substantially similar to the contents of other treatises on which Gurley relied.   *See id*. at 4-5.   Gurley revised neither his methodology nor his conclusions as a

result of his citation to *Cost of Capital III*.  Finally, the plaintiff's counsel had sufficient notice to

prepare effectively for cross-examination of Gurley at the *Daubert* hearing regarding that treatise.

For all of the foregoing reasons, the plaintiff's objection to admission of Defendants' Exh. 20

is overruled.

## B.  Applicable Legal Standards

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the
> case.

Fed. R. Evid. 702.  Under Rule 702, "it is the responsibility of the trial judge to ensure that an expert

is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure

that the testimony rests on a reliable basis."  *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22,

25 (1st Cir. 2006).  With respect to reliability:

> In *Daubert,* the Supreme Court set forth four general guidelines for a trial judge to
> evaluate in considering whether expert testimony rests on an adequate foundation:
> (1) whether the theory or technique can be and has been tested; (2) whether the
> technique has been subject to peer review and publication; (3) the technique's known
> or potential rate of error; and (4) the level of the theory or technique's acceptance
> within the relevant discipline.  However, these factors do not constitute a definitive
> checklist or test, and the question of admissibility must be tied to the facts of a
> particular case.

*Id.* (citations and internal quotation marks omitted); *see also, e.g., Zachar v. Lee*, 363 F.3d 70, 76

(1st Cir. 2004) ("The court's assessment of reliability is flexible, but an expert must vouchsafe the

reliability of the data on which he relies and explain how the cumulation of that data was consistent

with standards of the expert's profession.") (citation and internal quotation marks omitted).

As the First Circuit has observed, "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (citation and internal quotation marks omitted). "It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id*. (citation and internal quotation marks omitted). That said, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (citation and internal quotation marks omitted).

## C.   Analysis

The question as to whether Gurley's testimony is sufficiently reliable to pass *Daubert* muster is a close one. Prior to the instant litigation, and despite a combined depth of accounting experience of some 70 years, neither Gurley nor Filler was ever called upon to place a value upon a personal guaranty.[1] Nor, prior to this case, had either expert ever seen anyone employ the precise methodology Gurley used here for purposes of valuing a personal guaranty. On the other hand, Gurley testified at hearing that he followed the same overarching principles in this case that he, and any business valuation analyst, would use to value an asset, whether that asset be familiar or not. An

---

[1] Gurley, a certified public accountant with nearly 30 years' experience, is a principal of the Portland, Maine accounting and management firm Berry, Dunn, McNeil & Parker ("Berry, Dunn"). *See, e.g.*, Defendants' Exh. 1. He is a certified valuation analyst, accredited business valuation specialist and head of Berry, Dunn's Business Valuation Group. *See, e.g.*, *id*. He first became involved in business valuation, which has constituted at least 50 percent of his practice for the past decade, in 1979. Filler, a certified public accountant with 40 years' experience in that profession, has been involved in business valuation support for the past 17 years. For the past 10 years, business valuation has made up 90 percent of

8

analyst first performs a qualitative analysis, assessing the risks associated with the benefits purporting to flow from the asset, and then undertakes a quantitative analysis, assigning figures or numbers to those risks. When, as in this case, the asset in question is not readily marketable, business analysts employ what is known as the principle of substitution, pursuant to which they locate an asset, a transaction, or an indicator of value comparable to the subject asset.

In this case, at Step One (the qualitative analysis), Gurley concluded that the risk undertaken by the defendants in providing personal guaranties of repayment of WMI's debt to Androscoggin Savings Bank ("ASB") was comparable to that borne by an equity investor in WMI. At Step Two, he undertook a quantitative analysis pursuant to which:

1. Using standard equity-valuation methodologies, he calculated the cost to WMI of equity in the two relevant time periods (arriving at a full equity discount rate of 17.57 percent for WMI as of December 31, 2005 and 16.98 percent as of December 31, 2006), then deducted the borrowing cost, net of tax, that was paid to ASB, resulting in a guaranty fee rate for the 2005 guaranties of 12.14 percent through July 31, 2010 and 11.81 percent for the balance of the loan term and of 10.81 percent for the 2007 guaranties. *See, e.g.*, Plaintiff's Exh. D, ¶¶ 36-42; Defendants' Exhs. 15-16.

2. He calculated the guaranty fee at the stated rates over the term of the ASB financing and determined the present value of this stream of revenue at the full equity rate to arrive at a value of $1,272,825 for the 2005 guaranties and $216,750 for the 2007 guaranties. *See, e.g.*, Plaintiff's Exh. D, ¶ 43; Defendants' Exh. 16.

The plaintiff vigorously attacks this valuation opinion on the grounds that it is built on a faulty factual foundation and, more fundamentally, that it misapplies methodologically the very

---

his practice.

authorities on which it purports to rely.  In the plaintiff's view, Gurley's opinion has only one real underpinning: Gurley's *ipse dixit*.

   *Daubert* countenances the possibility that novel theories or methodologies can be reliable, and that old theories or methodologies reliably can be applied in new ways.  *See Daubert*, 509 U.S. at 593 ("Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication.  Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, and in some instances well-grounded but innovative theories will not have been published.  Some propositions, moreover, are too particular, too new, or of too limited interest to be published.") (citations omitted).  Yet novelty does not relieve the burden of proving reliability, a burden borne by the proponent of the challenged evidence.  *See, e.g., id.* at 597 ("We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations.  That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.") (footnote omitted); *Zachar*, 363 F.3d at 76 ("The court's assessment of reliability is flexible, but an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession."); *B.H. ex rel. Holder v. Gold Fields Mining Corp.*, No. 04-CV-0564-CVE-PJC, 2007 WL 188130, at *3 (N.D. Okla. Jan. 22, 2007) ("[T]he Court would not be fulfilling its duty as gatekeeper if it permitted the introduction of novel scientific methodology based solely on the assurances of the expert himself."); *Thorndike v. DaimlerChrysler Corp.*, 266 F. Supp.2d 172, 175 (D. Me. 2003) ("It is the proponent of the challenged evidence who carries the burden of proof.  That burden is not to prove that his or her expert's opinion or conclusion is correct, but that the expert's conclusion has been arrived at in a

scientifically sound and methodologically reliable fashion.") (citation and internal quotation marks omitted).

In the face of the plaintiff's vigorous challenge, the defendants fall short of carrying that burden.  It is true that, at a certain level of generality, Gurley can be said to have applied a reliable methodology in arriving at his conclusions.  He studied the relevant ASB loan and guaranty documents, analyzed relevant WMI financial data, and spoke to WMI personnel knowledgeable about the state of the company at the relevant times.  From these sources, he concluded that WMI was then on the brink of a forced liquidation, and that it was by no means certain its assets would exceed its liabilities.  He noted that the shareholders had given absolute, unconditional guaranties of WMI's debt to ASB and had waived their rights to subrogation (*i.e*., their rights to stand in the shoes of the bank as creditors of WMI) in the event their guaranties were called. Armed with these data and conclusions, he employed the "principle of substitution" to conclude that equity risk served as a fair proxy for the risk that the guarantors had undertaken.[2]  Taken at face value, this seems a straightforward application of recognized valuation methodology.  Nonetheless, a court must be careful not to conduct its *Daubert* gatekeeping analysis from too generalized a perspective.  *See, e.g., Black v. Food Lion, Inc*., 171 F.3d 308, 313-14 (5th Cir. 1999) ("The magistrate judge either substituted his own standards of reliability for those in *Daubert*, or he confused the *Daubert* analysis by adopting an excessive level of generality in his gatekeeping inquiry. . . . No one doubts the utility of medical histories in general or the process by which doctors rule out some known causes of

---

[2] While Gurley concluded that the guarantors' risk was tantamount to equity-investment risk, he calculated a lower return for them than for an equity investor by subtracting the net cost of the guarantied debt from the projected return on equity. He reasoned that the guarantors would be willing to accept a lower rate of return than the full equity rate because, while they were responsible for the full amount of the guaranty, they had not actually contributed cash to the corporation.

disease in order to finalize a diagnosis. But such general rules must . . . be applied fact-specifically in each case.") (footnote omitted).

In this case, everything hinged on, and flowed from, Gurley's determination that the risk of providing the personal guaranties was comparable to the risk of equity investment. The question presented, then, was whether Gurley reliably arrived at *that particular conclusion*. Gurley contends that the business-valuation literature supports the notion that, in some circumstances, the value of a personal guaranty is tantamount to the value of an equity investment. He relied on a leading treatise, Shannon P. Pratt, Robert F. Reilly & Robert P. Scweihs, *Valuing Small Businesses & Professional Practices* (3d ed.) ("*VSBPP*"), in reaching that conclusion, and identifies two other reputable texts as supporting it: *Cost of Capital III* and a publication of the Institute of Business Appraisers ("IBA") titled *Essential[s] of Business Appraisal: A Comprehensive Workshop – Course #8002B* ("*Appraisal Essentials*").

Gurley points, in particular, to a passage from *VSBPP* stating:

An often overlooked component of the cost of debt for small businesses and professional practices is *personal guarantees*. If an owner were to obtain a third-party guarantor on an arm's-length basis, there would be a charge for that service. There is not much data on this factor because few guarantees actually are arm's-length. However, it seems reasonable to recognize a premium of upwards of three percentage points to the face value interest rate if personal guarantees are required.

*VSBPP*, Defendants' Exh. 17, at 220 (emphasis in original). He notes that later in the same text, the authors observe: "If the down payment is small, the length of the term long, and protective covenants poor or absent, no rate may be high enough." *Id*. at 495. He posits that this closely summarizes the situation faced by WMI and the defendants in this case, with no protective covenants in place on the defendants' guaranties, which were given to secure repayment of long-term, or nominally short-term, but *de facto* long-term, debt. He explains that while the *VSBPP* indicates that no rate may be high enough, he used the upper limit of the cost of equity to a company

12

inasmuch as, faced with a decision to borrow at a rate above the cost of equity or raise additional

equity, the reasonable choice would be to raise additional equity.

Gurley also points out that, in a similar vein, the IBA cautions business-valuation experts to

be "careful when using the WACC [weighted average cost of capital method] when the long-term

debt requires the company owner(s)['] personal guaranty and/or pledge of personal assets.  Debt cost

may be equity or close to equity cost."  *Appraisal Essentials*, Defendants' Exh. 18, at 72.[3]

Finally, Gurley flags a passage from *Cost of Capital III* that provides:

When estimating the cost of debt for a closely held company, the analyst should
ascertain whether the debt is secured by personal guarantees.  If so, this is an
additional cost of debt that is not reflected directly in the financial statements (or, in
some cases, might not even be disclosed).  Such guarantees would justify an upward
adjustment in the company's cost of debt to what it would be without the guarantees
(assuming that the debt would be available without guarantees).  That is, you are
interested in the cost of company debt without the influence of the guarantor's pledge
of personal assets.

\*\*\*

[I]n the late 1990s, insurance companies offered guarantees on seller financing.  That
is, when a company was sold with some percentage of the price as a down payment
and the buyer gave the seller a promissory note for the balance (a common procedure
in the sale of small businesses and professional practices), the insurance company
would guarantee the note to the seller.  The required down payment was at least 30%
of the purchase price, and the insurance premium was about 3% per annum of the
face value of the note.  Perhaps 3% can be used as a shortcut estimate for adding to
the cost of debt to reflect personal guarantees.  Without personal guarantees, many
times no debt would be available, and all the company's capital structure should be
discounted at the cost of equity.

*Cost of Capital III* at 57.

Gurley concedes that *VSBPP*, the treatise on which he actually relied in formulating the

instant valuation opinion, does not lay out a methodology for valuing personal guarantees.  He points

---

[3] The WACC is "based on determining the required rate of return on both equity and debt in a company" and "is typically used when appraising the market value of invested capital."  *Appraisal Essentials* at 72.

out, however, that *VSBPP* is a professional treatise, not a set of step-by-step instructions.  He reasons that it is up to the careful professional to interpret Pratt's meaning, and to him (Gurley) the meaning is obvious.  If one knows the top number (equity, as he contends Pratt suggests) and the bottom number (the cost of borrowing, net of tax), one simply subtracts one from the other to arrive at the result.

Filler's testimony at hearing raises significant doubt that Pratt's meaning is obvious to the careful professional.  As Filler underscored, the passages on which Gurley relies to support his methodology all pertain to valuation of the cost of debt in the context of appraisal of the value of a business.  They simply do not purport to address the question of how to value a personal guaranty.  Filler persuasively testified that one cannot fairly infer, from a statement that in some circumstances the cost of debt should be discounted at the cost of equity when valuing a business, that a guaranty *itself* can be worth that much.  He suggested that, if Gurley wanted to use *VSBPP* as a springboard for valuing personal guaranties, he might have considered comparing the value of the business with the guaranties versus the value without, rather than "directly" valuing the guaranties using a premium applicable in a different context.[4]

This has been a difficult and hard-fought issue.  At a certain level of generality, Gurley can be said to have followed tried-and-true business valuation practices in arriving at the conclusion that personal guaranties given by the defendants in 2005 were worth $1,272,825, and those given by the

---

[4] The plaintiff alternatively argued, both in his papers and at hearing, that even assuming the treatises supported Gurley's methodology, Gurley misapplied it by overlooking or misapprehending material facts, for example, the fact that the guarantied debt was secured by the company's real estate and other assets, which the company's financial statements indicated were sufficiently valuable to repay that debt.  *See, e.g.*, Exclude Reply at 5-6.  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. . . .  It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury [that] such testimony [must] be excluded on foundational grounds." *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp.2d 303, 308-09 (D. Me. 2005) (citations and internal quotation marks omitted).  Inasmuch as I find that the defendants fail to carry their burden of proving Gurley's methodology reliable, I

defendants in 2007 were worth $216,750. Yet Gurley has never valued a personal guaranty; neither Gurley nor Filler has ever seen anyone value a personal guaranty using the methodology Gurley employed here; and Filler's testimony raises significant doubt about whether the treatises cited by Gurley do in fact support his methodology, in which case it would be buttressed by nothing but his *ipse dixit*. In these circumstances, I conclude that the defendants have failed to sustain their burden of proving the reliability of the challenged expert testimony. The plaintiff's motion to exclude Gurley's testimony accordingly is granted insofar as it concerns the value of personal guaranties.

## II.  Cross-Motions for Summary Judgment

### A.  Summary Judgment Standards

#### 1.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, __ F.3d __, 2008 WL 2600451, at *2 (1st Cir. July 2, 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymí v. Puerto Rico Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to

---

need not consider whether his opinion is so ill-fitted to the underlying facts that it should be excluded under *Daubert* on this additional basis, as well.

the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc*., 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id*. (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co*., 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*. Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

## 2.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a

specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(e). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted." (citations and internal punctuation omitted).

**B. Factual Context**

17

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following facts relevant to this recommended decision:[5]

WMI is a Delaware corporation with its place of business in Lewiston, Maine. Defendants' Statement of Material Facts ("Defendants' SMF") (Docket No. 30) ¶ 1; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Opposing SMF") (Docket No. 38) ¶ 1.[6] It manufactures flue gas de-sulphurization systems that remove pollutants from the emissions of industrial facilities. *Id.* ¶ 2.

WMI was incorporated as a Delaware corporation on June 19, 2000 under the name WEP Acquisition, Inc. for the purpose of attempting to acquire the assets of Wahlco Engineered Products ("WEP"), a subsidiary of Thermatrix, Inc. ("Thermatrix"), which was then in bankruptcy. Plaintiff's Amended Statement of Undisputed Material Facts in Support of His Motion for Summary Judgment ("Plaintiff's SMF") (Docket No. 36) ¶ 1; Defendants' Opposing Statement of Material Facts ("Defendants' Opposing SMF") (Docket No. 41) ¶ 1. On January 8, 2001, WMI was authorized to do business in Maine. *Id.* ¶ 2. On or about January 17, 2001, while still operating under the name WEP Acquisition, Inc., WMI acquired certain of the assets of four entities: WEP, Bachman Companies, Inc., Wahlco, Inc. and Wahlco Environmental Systems, Inc. (collectively, "Predecessor Entities"). *Id.* ¶ 3. The effort to procure the assets of the Predecessor Entities via a management buyout in the Thermatrix bankruptcy proceeding was the plaintiff's brainchild. Plaintiff's SMF ¶ 4;

---

[5] As noted above, Local Rule 56 requires a party responding to a statement of material facts to admit, deny, or qualify the underlying statement. *See* Loc. R. 56(c)-(d). The concept of "qualification" presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information. Except to the extent that a party, in qualifying a statement, has expressly controverted all or a portion of the underlying statement, I have deemed it admitted.

[6] I have melded the parties' two sets of statements of material facts, eliminating redundancies, for purposes of setting

Affidavit of Alexander G. Baldwin in Support of His Motion for Partial Summary Judgment ("Baldwin Aff."), Exh. B thereto, ¶ 2.[7]

While formulating a plan for a management buyout of the Predecessor Entities' assets in 2000, the plaintiff approached Bader, a longtime friend with extensive financial experience, about possibly participating in the same. Plaintiff's SMF ¶ 5; Defendants' Opposing SMF ¶ 5. Bader had had no prior dealings with Thermatrix or the Predecessor Entities. *Id.* The other defendants were all employed by Thermatrix or the Predecessor Entities before the management buyout and the creation of WMI. *Id.* ¶ 6. Effective as of February 28, 2001 in Delaware, and March 21, 2001 in Maine, WMI officially changed its name from WEP Acquisition, Inc. to WahlcoMetroflex, Inc. *Id.* ¶ 7. WMI commenced business, using the assets acquired from the Predecessor Entities, in early 2001. *Id.* ¶ 8. Bader was appointed the sole director of WMI following its incorporation. *Id.* ¶ 10. On or about January 16, 2001, the plaintiff was appointed vice-president of WMI. *Id.* ¶ 15. On or about January 25, 2001, the plaintiff was appointed a director of WMI as well as the corporation's president and chief executive officer. *Id.* ¶ 16. The defendants are WMI's current directors. Defendants' SMF ¶ 12; Plaintiff's Opposing SMF ¶ 12.

The WEP acquisition was made possible by financing obtained primarily through Wells Fargo Business Credit ("Wells Fargo"). *Id.* ¶ 4. The Wells Fargo financing consisted of a term note in the amount of $365,000, which was used to fund the WEP acquisition, and a line of credit with a face value of up to $3,385,000. *Id.* ¶ 5. WMI needed this line of credit to provide working capital that would fund the capital-intensive projects upon which its business ultimately would depend. *Id.* ¶ 6. The Wells Fargo financing was secured by a first-priority security interest in WMI's working-

---

forth the evidence cognizable on summary judgment.

[7] The defendants deny this statement on the ground that it is unsupported by the citations given, *see* Defendants'

capital assets (inventory and accounts receivable) and a second mortgage on WMI's real estate. Plaintiff's SMF ¶ 20; Defendants' Opposing SMF ¶ 20. In addition, Wells Fargo required that the plaintiff and the defendants all provide personal guaranties to secure the startup financing. Defendants' SMF ¶ 7; Plaintiff's Opposing SMF ¶ 7. The plaintiff and Bader each provided unlimited personal guaranties; the remaining defendants provided limited guaranties capped at 14.28 percent of any outstanding principal and interest due. *Id.* ¶ 8.[8] WMI's shareholders had neither a written nor an oral obligation to provide guaranties of the corporation's debt. Plaintiff's SMF ¶ 22; Defendants' Opposing SMF ¶ 22.

Neither the plaintiff nor any of the defendants demanded or received any compensation in consideration for providing guaranties on the Wells Fargo loan, and there was never any discussion among the WMI shareholders about granting the plaintiff or Bader compensation (in whatever form) in return for their unlimited guaranties. *Id.* ¶ 25. None of the defendants who provided limited guaranties to Wells Fargo was asked or required to forgo any WMI ownership interest or other benefits of ownership or employment by WMI in return for having his guaranty exposure capped. *Id.* ¶ 26. The Wells Fargo guaranties provided by the plaintiff and the defendants remained in effect until August 2005, when the lending relationship ended by repayment of the Wells Fargo financing. *Id.* ¶ 31.

---

Opposing SMF ¶ 4; however, it is supported by at least one of those citations, to the plaintiff's affidavit.

[8] The parties dispute whether, as the plaintiff contends, Wells Fargo originally asked that all of the defendants provide unlimited guaranties but Boulet, Brousseau, Hall, Poulin and Powell refused to do so. *Compare* Plaintiff's SMF ¶ 24; Deposition of John W. Bader ("Bader Dep."), Exh. E to Plaintiff's SMF, at 29 *with* Defendants' Opposing SMF ¶ 24; Affidavit of Steven Boulet in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment, attached to Plaintiff's SMF, ¶ 9; Affidavit of Michael Brousseau in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment, attached to Plaintiff's SMF, ¶ 9; Affidavit of Scott Hall in Support of Plaintiff's Motion for Summary Judgment, attached to Plaintiff's SMF, ¶ 9; Affidavit of Roger Poulin in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment, attached to Plaintiff's SMF, ¶ 9; Affidavit of John Powell in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment, attached to Plaintiff's SMF,

In addition to providing these guaranties, the plaintiff and the defendants each personally guarantied additional startup financing from other lenders and made capital contributions to WMI in the amount of approximately $14,285 each. Defendants' SMF ¶ 9; Plaintiff's Opposing SMF ¶ 9. In return, the plaintiff and the defendants each received fifty shares of WEP stock, giving each party a 14.28 percent interest in the company. *Id.* ¶ 10. Neither the plaintiff nor any of the defendants has ever contributed additional funds to capitalize WMI after the initial $100,000 infusion. Plaintiff's SMF ¶ 14; Defendants' Opposing SMF ¶ 14.

Because WMI had purchased a business that had just emerged from bankruptcy and therefore had no track record, and there were concerns about its ability to operate as a stand-alone entity, no conventional banks were willing to provide it with working-capital financing. *Id.* ¶ 18. WMI's history as part of a bankrupt company made it difficult to obtain favorable financing terms. Defendants' SMF ¶ 13; Plaintiff's Opposing SMF ¶ 13. For example, Wells Fargo agreed to advance funds pursuant to a line of credit based only on the value of existing assets and not based on work in process ("WIP"). *Id.* ¶ 14. This had the practical effect of limiting WMI to drawing only approximately half of the face value of the Wells Fargo line of credit. *Id.* ¶ 15. This, in turn, had the effect of limiting the number and scope of projects in which WMI could be involved at any one time. *Id.* ¶ 16. In addition, Wells Fargo imposed burdensome monthly charges, including a $10,000 minimum interest charge each month regardless of the extent to which WMI had drawn on the line of credit. *Id.* ¶ 17.

In early 2001, WMI borrowed a total of $900,000 in additional funds from the Finance Authority of Maine ("FAME"), the Androscoggin Valley Council of Governments ("AVCOG"), and Coastal Enterprises, Inc. ("CEI"). Plaintiff's SMF ¶ 27; Defendants' Opposing SMF ¶ 27. The

¶ 9.

plaintiff and all of the defendants provided limited guaranties for those loans; none of the shareholders demanded compensation for providing those guaranties or was provided compensation for the same. *Id.* ¶ 28. The loans from FAME, AVCOG, and CEI were secured by a first-priority mortgage in all real estate owned by WMI and a second-priority security interest in WMI's working-capital assets, *i.e.*, inventory and accounts receivable. *Id.* ¶ 29.

In November 2002, the shareholders of WMI (the plaintiff and the defendants) voted to increase the size of the company's board of directors ("Board") such that the plaintiff and all of the defendants thenceforth would serve as directors of the corporation. *Id.* ¶ 32. Since the inception of WMI, the Board and the shareholders have repeatedly discussed the merits of naming additional directors who are not shareholders and/or officers of WMI, and, on at least one occasion, agreed that 40 percent of the director positions should be filled by outside directors. *Id.* ¶ 33. Despite these discussions, no outside directors ever were appointed to the Board. *Id.*[9]

WMI operated at a net loss during its first three years in business, losing $759,000 over that time, leading the plaintiff and the defendants to engage in extensive efforts to sell the company or find additional investors in 2003. Defendants' SMF ¶ 19; Plaintiff's Opposing SMF ¶ 19. Bader, WMI's chief financial officer, also engaged in efforts to find a lender to replace Wells Fargo so that WMI would have an expanded ability to borrow against WIP. *Id.* ¶ 20. These efforts to find purchasers, investors or alternative lenders were unsuccessful, as were continuing efforts to find buyers or investors in 2004. *Id.* ¶ 21.[10]

---

[9] The defendants deny paragraph 33, but only to the extent that it calls for a legal conclusion as to what constitutes an "independent" director or whether WMI's directors are "independent." Defendants' Opposing SMF ¶ 33. I have addressed this objection by using the phrase "outside directors."

[10] The plaintiff qualifies this statement, asserting that multiple entities expressed interest in investing in or purchasing WMI outright, but terms that were acceptable to both sides were never reached. Plaintiff's Opposing SMF ¶ 21; Affidavit of Alexander G. Baldwin in Support of His Opposition to Defendants' Motion for Partial Summary Judgment

In April 2004, the plaintiff resigned as president and director of WMI. *Id.* ¶ 24.[11]  Since then, he has drawn no salary and received no other compensation from WMI. Plaintiff's SMF ¶ 39; Defendants' Opposing SMF ¶ 39.  Between that time and August 2005, when the Wells Fargo financing was paid off and his unlimited guaranty retired, the plaintiff received no compensation for provision of that guaranty. *Id.* ¶ 40.  Notwithstanding his resignation as an officer and director of WMI, the plaintiff retained his ownership of fifty shares of the company's common stock. *Id.* ¶ 41.

Following the plaintiff's resignation, the Board was composed of the six defendants, who have served as the directors of WMI continuously since then. *Id.* ¶ 42.  The defendants persisted in trying to build WMI into a financial success after the plaintiff left the company. Defendants' SMF ¶ 25; Plaintiff's Opposing SMF ¶ 25.  However, the company continued to struggle. *Id.* ¶ 26.[12]  By

---

("Baldwin Opp. Aff."), Exh. 1 thereto, ¶ 4.

[11] The parties dispute the extent to which the plaintiff disengaged from WMI prior to officially resigning.  The defendants assert that in late 2003, he stopped spending any time at WMI's facility and stopped playing any active role in the management of the company, and by no later than January 2004, while he was still WMI's president, he began working as a consultant for British Petroleum ("BP") and left WMI without any functioning president. Defendants' SMF ¶¶ 22-23;  Affidavit of John Bader in Support of Defendants' Motion for Partial Summary Judgment ("Bader Aff."), attached thereto, ¶¶ 25-26; Deposition of Alexander G. Baldwin ("Baldwin Dep."), Exh. D to Plaintiff's SMF, at 98-99; *see also* Defendants' Opposing SMF ¶ 34.  The plaintiff states that, while he began scaling back his involvement with WMI in late 2003, he continued both to spend time at the WMI facility and to play an active role in management of the company as both an officer and a director.  Plaintiff's Opposing SMF ¶¶ 22-23; Baldwin Opp. Aff. ¶ 5; *see also* Plaintiff's SMF ¶ 34. The plaintiff asserts that he began scaling back his involvement with WMI for a number of reasons, the most significant one of which was that his strategic vision for the company was diverging from that of the defendants. Plaintiff's SMF ¶ 35; Baldwin Aff. ¶ 14.  He states that, as a result of this friction, as well as his dissatisfaction with the direction in which the company was being taken and his uncertainty about whether his relationship with the defendants could work on a long-term basis, he was loath to relocate his entire family to Maine from Tennessee. *Id.*  He asserts that, given his concerns about differences with the defendants on the future of WMI, he began exploring other employment opportunities and took a job as a consultant to BP in the first quarter of 2004.  Plaintiff's SMF ¶ 36; Baldwin Aff. ¶ 15. He says that after he notified the defendants and WMI of his new job with BP, he unilaterally reduced his WMI salary by 75 percent.  Plaintiff's SMF ¶ 37; Baldwin Aff. ¶ 16.  The defendants counter that the plaintiff never mentioned any of his asserted concerns to them, simply disappearing from WMI without any notice to them while he was still a WMI director and officer.  Defendants' Opposing SMF ¶¶ 34-37; Affidavit of John Bader in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Bader Opp. Aff."), attached thereto, ¶¶ 28-29.

[12] The plaintiff qualifies this statement, asserting that while WMI did experience financial problems after he departed, it

year-end 2004, the company had a net retained earnings deficit of approximately $555,000. *Id.* ¶ 27. In late 2004, the officers and directors of WMI began discussing the possibility of establishing a financing relationship with ASB that would enable WMI to replace its then-existing lending relationship with Wells Fargo. Plaintiff's SMF ¶ 45; Defendants' Opposing SMF ¶ 45. The Board's interest in obtaining new financing to "take out" Wells Fargo was not precipitated by any decision by Wells Fargo to stop providing financing or to terminate the lending relationship with WMI; rather, it was purely a business decision by the Board to seek financing upon more favorable terms. *Id.* ¶ 46.

In early 2005 Poulin, WMI's director of materials, informed Bader that WMI would need an infusion of at least $200,000 to fund a project and that, without such an infusion, WMI could not work on the project and would have to send its employees home. Defendants' SMF ¶ 28; Plaintiff's Opposing SMF ¶ 28.[13] Bader subsequently was able to secure a commitment of $205,000 in financing from AVCOG. *Id.* ¶ 30. AVCOG initially demanded unlimited guaranties from each of WMI's shareholders as a condition of making the loan. *Id.* ¶ 31. However, three of the defendants – Brousseau, Poulin and Boulet – informed Bader that they would not be willing to provide any guaranties for new financing unless (i) the risk would be shared equally by all shareholders or (ii) they received some form of compensation if the risk was not shared equally. *Id.* ¶ 32. Brousseau, Poulin and Boulet were concerned that other shareholders would not be willing to provide guaranties and assume risks taken on by the remaining shareholders. *Id.* ¶ 33. In the

---

nevertheless overcame those challenges, continued to grow and ultimately prospered. Plaintiff's Opposing SMF ¶ 26; Baldwin Opp. Aff. ¶ 6.

[13] The parties dispute whether the failure to obtain $200,000 in financing would have meant the end of WMI as a going concern, as the defendants assert. *Compare* Defendants' SMF ¶ 29; Bader Aff. ¶ 31 *with* Plaintiff's Opposing SMF ¶ 29; Baldwin Opp. Aff. ¶ 7. In the plaintiff's view, while this may have led to a temporary cessation of operations, it would not necessarily have meant that WMI was defunct. Plaintiff's Opposing SMF ¶ 29; Baldwin Opp. Aff. ¶ 7.

defendants' view, the ability to spread the risk equally among all shareholders was important because a greater number of guarantors would potentially reduce the extent of liability for any individual guarantor by increasing the amount of assets available to a creditor in the event of default. *Id.* ¶ 34.[14]

The foregoing presented a difficult situation for WMI and the defendants. *Id.* ¶ 35. The defendants knew that the decision of some shareholders not to provide guaranties could deprive WMI of the opportunity to obtain the financing it needed to stay in business. *Id.* ¶ 36. At the same time, WMI had a limited ability to offer any form of compensation as consideration for guaranties because it had no cash available to pay guarantors. *Id.* ¶ 37.[15] The defendants addressed these issues at a Board meeting held on March 9, 2005. *Id.* ¶ 38. By this time, WMI's corporate counsel, Wayne Tumlin, had suggested to the defendants that WMI could issue shares as consideration for personal guaranties provided by shareholders to help secure financing for the company because there was no cash available to pay a guaranty fee. *Id.* ¶ 39.[16] WMI's Board relied upon advice of counsel to determine that it could issue shares in exchange for guaranties. Defendants' Statement of Additional Facts ("Defendants' Additional SMF"), commencing at page 20 of Defendants' Opposing SMF, ¶ 130; Plaintiff's Reply Statement of Undisputed Material Facts ("Plaintiff's Reply SMF") (Docket No. 46) ¶ 130.

To determine what the value of personal guaranties would be to WMI, the defendants considered WMI's value, their prior determinations as to what they would offer a third-party

---

[14] The plaintiff's objection to this paragraph, on the basis that it is thinly veiled argument, *see* Plaintiff's Opposing SMF ¶ 34, is overruled. I have modified the defendants' statement to make clear what is implicit: that this was the defendants' view, not necessarily an immutable truth in all situations.

[15] The plaintiff qualifies this statement, asserting that there is no indication that the defendants considered any sort of alternative compensation, such as the issuance of notes. Plaintiff's Opposing SMF ¶ 37; Baldwin Opp. Aff. ¶ 10.

[16] I sustain the plaintiff's objection to paragraph 40 of the Defendants' SMF, *see* Plaintiff's Opposing SMF ¶ 40, on the

investor as an incentive to invest in WMI, and the level of incentive that would be necessary to elicit guaranties from reluctant shareholders.  Defendants' SMF ¶ 41; Plaintiff's Opposing SMF ¶ 41.[17] As to the first of these considerations, the defendants reached the conclusion that WMI was insolvent and had a negative forced-liquidation value.  *Id.* ¶ 42.[18]  This conclusion was based on Bader's advice as CFO, which in turn was based on his review of all of WMI's internal financial information and audited financial statements.  *Id.* ¶ 43.  The conclusion was also based on the remaining defendants' own prior review of WMI's financial information.  *Id.* ¶ 44.  WMI's internal financial records showed that, in addition to net losses incurred by year-end 2004, the company lost $127,237 during the first two months of 2005.  *Id.* ¶ 45. As of early 2005, the company persistently had a negative cash flow.  *Id.* ¶ 46.[19]  WMI was unable to meet its current obligations in March 2005.  *Id.* ¶ 47.  As of March 4, 2005, WMI had $455,191 in accounts payable that was more than 60 days past due, $118,514 of which was more than 90 days past due.  *Id.* ¶ 48.  As of March 2005, WMI had been able to make payroll by less than $100 on more than one occasion even though the defendants had all taken pay cuts to help make ends meet.  *Id.* ¶ 49.  WMI's internal financial records also showed that the company's liabilities exceeded the value of its assets by $413,415 as of

---

basis that the defendants' characterization of the underlying testimony is not supported by the citation provided.

[17] The plaintiff qualifies this statement, asserting that the defendants considered only the liquidation value of WMI as a whole, not its fair market value or whether its assets would be sufficient to cover all secured liabilities for which they had provided guaranties.  Plaintiff's Opposing SMF ¶ 41; Bader Dep. at 74-75, 78-80, 315-16, 324-25.

[18] The plaintiff qualifies this statement, asserting that the defendants determined that WMI was insolvent under generally accepted accounting principles ("GAAP") as evidenced by their review, *inter alia*, of the company's 2004 financial statements, but a review of the 2004 and 2005 financial statements shows that WMI was not insolvent on an estimated-current-value basis in 2005.  Plaintiff's Opposing SMF ¶ 42; Financial Statements of Wahlco*Metroflex*, Inc., December 31, 2004 ("2004 Financial Statements"), Exh. H to Plaintiff's SMF, at 4; Financial Statements of Wahlco*Metroflex*, Inc., December 31, 2005 ("2005 Financial Statements"), Exh. S to Plaintiff's SMF, at 3.

[19] The plaintiff qualifies this statement, asserting that it is unclear to him what period of time "early 2005" encompasses, and a review of the statements of cash flow in the 2004 and 2005 financial statements shows that WMI had a positive net cash flow of $118,511 for 2004 and a positive net cash flow of $33,969 for 2005.  *See* Plaintiff's Opposing SMF ¶ 46; 2004 Financial Statements at 6; 2005 Financial Statements at 5.

year-end 2004. *Id.* ¶ 50. By March 2005, WMI's liabilities exceeded the value of its assets by more than $580,000. *Id.* ¶ 51. Based on this information, the defendants determined that WMI would be subject to a forced liquidation if it did not close on the AVCOG financing and that all shareholders, including the plaintiff, would be subject to personal liability in such an event. *Id.* ¶ 52.[20]

The defendants' conclusions regarding WMI's value also were informed by their observations of what happened when another local company, Dumont Manufacturing ("Dumont"), was forced to liquidate. *Id.* ¶ 53. Dumont was a common refrigeration systems fabrication company located in Monmouth, Maine. Plaintiff's Additional Statement of Undisputed Material Facts ("Plaintiff's Additional SMF"), commencing at page 25 of Plaintiff's Opposing SMF, ¶ 154; Baldwin Opp. Aff. ¶ 27.[21] The reputation and proven performance of WMI products have led to its acceptance in exclusive and restricted worldwide industrial marketplaces (utility, petrochemical, refining, etc.); as stated in WMI's own literature, "these products gained such market share dominance in the global coal-fired power generation market that 'Wahlco' became generic with gas conditioning systems and, in many respects, remain so today." Plaintiff's Additional SMF ¶ 157; Defendants' Reply SMF ¶ 157.[22] Like WMI, Dumont was in the business of engineered-to-order metal fabrication and therefore had assets similar to those of WMI. Defendants' SMF ¶ 54;

---

[20] The plaintiff qualifies this statement, asserting that while the defendants may have made this determination, it was incorrect inasmuch as (i) the 2004 and 2005 Financial Statements indicated that WMI was not insolvent on an estimated-current-value basis at the end of those years, (ii) the 2005 Financial Statements indicated that WMI had a net positive cash flow, and (iii) there was no risk that shareholders' guaranties would be called if WMI's assets were liquidated. Plaintiff's Opposing SMF ¶ 52. These assertions, some of which the defendants dispute or qualify, are fleshed out elsewhere in my recitation of facts.

[21] The parties dispute whether Dumont went out of business in 2001, Plaintiff's Additional SMF ¶ 154; Baldwin Opp. Aff. ¶ 27, or 2002, Defendants' Reply Statement of Material Facts ("Defendants' Reply SMF") (Docket No. 49) ¶ 154; Affidavit of John Bader in Support of Defendants' Reply Memorandum ("Bader Reply Aff."), attached thereto, ¶ 5.

[22] The plaintiff also posits that WMI was and is one of a handful of firms globally that possess the expertise, technology, and equipment to engineer, as well as actually fabricate, gas conditioning systems. Plaintiff's Additional SMF ¶ 156; Baldwin Opp. Aff. ¶ 29. The defendants dispute that WMI engineers gas conditioning systems. Defendants' Reply SMF

Plaintiff's Opposing SMF ¶ 54.[23]  Dumont received pennies on the dollar for its assets in a forced liquidation.  *Id.* ¶ 55.[24]

As for the value of personal guaranties, the defendants had previously determined during negotiations with a potential investor (CEI) in late 2004 or early 2005 that they would be willing to offer a 10 percent equity interest as consideration for an investment of approximately $200,000.  *Id.* ¶ 56; *see also* Defendants' Additional SMF ¶ 116; Plaintiff's Reply SMF ¶ 116.  The defendants determined collectively that this constituted a fair level of incentive for shareholders to provide personal guaranties because it was based on what WMI was willing to offer an arms-length investor. *Id.* ¶ 57.  At the same time, the shareholders who were reluctant to take the risk associated with new financing indicated that a similar equity offering could be sufficient incentive for them to provide new guaranties.  *Id.* ¶ 58.

Bader had discussions with Nat Henshaw, a representative of CEI, in early 2004 about the possibility of having CEI invest in WMI.  Plaintiff's SMF ¶¶ 64, 66; Defendants' Opposing SMF ¶¶ 64, 66.[25]  During those discussions, "[v]aluation was discussed but a number was never

---

¶ 156; Bader Reply Aff. ¶ 6.

[23] The parties disagree as to the degree to which Dumont was similar to WMI.  The plaintiff states that, unlike WMI, Dumont lacked the expertise, technology and equipment to create new products from the ground up; instead, it undertook general fabrication in which it would simply be provided with engineering plans by a customer and would produce the requested systems on a contract basis.  Plaintiff's Additional SMF ¶ 155; Baldwin Opp. Aff. ¶ 28.  The defendants assert that Dumont had the expertise to create products from the ground up.  Defendants' Reply SMF ¶ 155; Bader Reply Aff. ¶ 5.

[24] I omit the balance of paragraph 55, sustaining the plaintiff's objection, *see* Plaintiff's Opposing SMF ¶ 55, that it is in the nature of an argument rather than a fact.

[25] The parties differ in their characterization of the context of the CEI negotiations, with the plaintiff asserting that CEI was considering possibly buying the plaintiff's shares of stock after his resignation and/or making a direct equity investment in WMI in exchange for shares of stock, and the defendants stating that WMI needed an infusion of cash to stay afloat.  *Compare* Plaintiff's SMF ¶ 65; Bader Dep. at 58-59 *with* Defendants' Opposing SMF ¶ 65; Bader Dep. at 61-62.

exchanged," and the value of WMI "was always a mystery" to both Henshaw and Bader. *Id.* ¶ 67.[26] Bader was uncomfortable providing a value for WMI to Henshaw during these discussions, and Henshaw never provided Bader with his thoughts on the corporation's value or the value of the plaintiff's WMI shares. *Id.* ¶ 68. Henshaw never made an offer for the plaintiff's shares, although Henshaw and Bader did discuss the possibility of CEI making an investment of $200,000 to $500,000 in WMI. *Id.* ¶ 69. The defendants and WMI never provided Henshaw with a figure or range or figures representing the number of WMI shares that CEI would receive in return for an investment; conversely, Henshaw never suggested a number of shares that CEI would require in return for an investment in CEI. *Id.* ¶ 70. In early 2005, and prior to obtaining the $205,000 AVCOG loan, the directors believed that if they offered CEI "up to" a 10 percent ownership interest in WMI, that might have been sufficient to entice CEI to invest $205,000 needed to fund the project at issue – an investment that would obviate the need to borrow from AVCOG; however, this offer never was conveyed to Henshaw. *Id.* ¶ 71. Henshaw never offered any financing on behalf of CEI in early 2005 for the project at issue or for any other purpose. *Id.* ¶ 72.

The defendants voted at the March 2005 Board meeting to approve a formula pursuant to which any shareholder who provided a guaranty for the AVCOG financing or any future financing would receive shares in an amount equaling five percent of the outstanding equity in the company per $100,000 of financing guaranteed ("Guaranty Shares Formula"). Defendants' SMF ¶ 59; Plaintiff's Opposing SMF ¶ 59. During the Board's discussions of the AVCOG loan and the issuance of shares in return for guaranties, the Board acknowledged that this course of action could raise "potential dilution issues" because it was proposed that WMI issue authorized but then

---

[26] The defendants qualify this statement, asserting that Bader has testified in no uncertain terms that the defendants were aware of the opinion that WMI had a negative forced-liquidation value in 2005. Defendants' Opposing SMF ¶ 67; Bader

unissued shares of common stock.  Plaintiff's SMF ¶ 74; Defendants' Opposing SMF ¶ 74.  The

AVCOG financing closed on March 22, 2005.  Defendants' SMF ¶ 60; Plaintiff's Opposing SMF

¶ 60.  Each defendant provided an unlimited personal guaranty for the financing.  *Id*. ¶ 61.  In late

2004 and through early 2005, including at the time of the March 9, 2005 Board meeting when the

Guaranty Shares Formula was adopted, neither the defendants nor WMI "had a clue" as to the fair

market value of WMI.  Plaintiff's SMF ¶ 51; Bader Dep. at 74-76, 78-80.[27]  The defendants and

WMI did not request assistance from any outside consultants (including Purdy Powers) in

determining the value for WMI or in generating the Guaranty Shares Formula.  Plaintiff's SMF ¶ 54;

Bader Dep. at 120-21.[28]  Rather, the formula was set because it was "the only number that all

guarantors could agree upon."  Plaintiff's SMF ¶ 55; Bader Dep. at 101-02, 119-20.[29]  Although

Bader did testify that the defendants had no knowledge as to WMI's fair market value in 2005, he

also stated in no uncertain terms that a fair-market-value analysis was irrelevant in 2005 and that the

---

Dep. at 174; Bader Aff. ¶ 43.

[27] The defendants purport to deny this statement; however, they admit that they did not know the company's value under a fair-market-value analysis.  Defendants' Opposing SMF ¶ 51.  They point out that they had reached the conclusion that the company had a negative value under a forced-liquidation analysis.  *Id*.

[28] The defendants purport to deny this statement, but their denial is more in the nature of a qualification: they state that it is not accurate to say that they "did not request assistance" from outside consultants when the fact was that WMI did not have any cash available to hire valuation consultants in 2005.  Defendants' Opposing SMF ¶ 54; Bader Opp. Aff. ¶¶ 18, 24.

[29] The defendants deny this statement on grounds that the plaintiff relies partly on testimony provided under objection, rendering it inadmissible, and that Bader's full testimony was that the defendants determined the value of guaranties through a process that examined the company's value, prior negotiations with potential investors, and the level of incentive needed to elicit guaranties from shareholders.  Defendants' Opposing SMF ¶ 55.  The defendants' objection to the form of the question is overruled: counsel merely restated an answer that Bader had given earlier and asked him to verify whether the restatement was correct.  *See* Bader Dep. at 119-20.  The remaining basis for the defendants' denial is essentially a qualification.  The plaintiff admitted those portions of the Defendants' SMF containing those assertions, and they are set forth above.

defendants did determine WMI's value in 2005 under a forced-liquidation analysis. Defendants' Additional SMF ¶ 140; Plaintiff's Reply SMF ¶ 140.[30]

Tumlin advised the defendants in 2005 to forgo receiving shares in connection with financing obtained that year from AVCOG because the plaintiff might not have received sufficient, timely notice to make an informed decision whether to provide a personal guaranty of the AVCOG loan. Defendants' SMF ¶ 62; Plaintiff's Opposing SMF ¶ 62. No shares were issued in connection with the AVCOG financing due to concerns that the plaintiff had not been given sufficient notice to participate. *Id.*[31]

In April 2005, Bader informed the plaintiff that the issue of providing shares for guaranties would be addressed at a shareholders' meeting to be held the following week. *Id.* ¶ 63. Bader sent the plaintiff an e-mail alerting him to "an attempt by some people to somewhat dilute your shares." Plaintiff's SMF ¶ 75; e-mail dated April 4, 2005 from Bader to Plaintiff ("4/4/05 Bader e-Mail"), Exh. N to Plaintiff's SMF.[32] The e-mail goes on to state that there are "informal discussions" going on among the defendants about issuing additional WMI shares to shareholders who provided

---

[30] The parties dispute whether fair market value was in fact relevant to WMI in 2005. The defendants contend that it was irrelevant inasmuch as WMI was on the brink of a forced liquidation. Defendants' Additional SMF ¶ 143; Bader Opp. Aff. ¶ 23. The plaintiff asserts that it was relevant inasmuch as the failed negotiations with Henshaw of CEI, which he reasons necessarily would be based on fair market value rather than liquidation value, were still in the picture then. Plaintiff's Reply SMF ¶ 143; Bader Dep. at 95-96.

[31] The plaintiff states that the defendants were angry that they did not receive shares in exchange for guaranties of the AVCOG loan because of the concerns WMI's counsel had raised. Plaintiff's SMF ¶ 81. I sustain the defendants' objection to this statement on the ground that the plaintiff relies on deposition testimony of Bader that lacks any foundation to establish the state of mind of any other defendant and is incomplete, omitting the fact that Bader blamed himself for that state of affairs, not the plaintiff. Defendants' Opposing SMF ¶ 81; Bader Dep. at 115.

[32] The defendants purport to deny this statement, but their denial is more in the nature of a qualification: they state that the e-mail was alerting the plaintiff to the fact that there would be a shareholders' meeting the next week and that "one topic of discussion would be the distribution of extra shares of stock to everyone who provided additional personal guarantees for the two new loans that we've taken." Defendants' Opposing SMF ¶ 75; 4/4/05 Bader e-Mail.

guaranties and claims that Bader has "no idea what kind of numbers of shares people are talking about[.]"  Plaintiff's SMF ¶ 76; 4/4/05 Bader e-Mail.[33]

The plaintiff attended both a Board meeting and a shareholders' meeting by telephone on April 14, 2005.  Defendants' SMF ¶ 64; Plaintiff's Opposing SMF ¶ 64.  The minutes of the April 14, 2005 Board meeting indicate that the meeting included a discussion and ratification of the minutes of the March 2005 Board meeting at which the Board approved the issuance of shares in exchange for providing personal guaranties.  *Id.* ¶ 65.[34]

After eventually being notified of the Board's decision (and subsequent to his receipt of the 4/4/05 Bader e-Mail) the plaintiff declined to guaranty the proposed AVCOG loan.  Plaintiff's SMF ¶ 78; Defendants' Opposing SMF ¶ 78.[35]  He declined to guaranty the AVCOG loan because (i) unlike all of the defendants, he was no longer an employee or officer of WMI and no longer

---

[33] The defendants deny this statement on the basis that it does not accurately characterize the e-mail, which speaks for itself and which indicates that there were "informal discussions" about a variety of issues.  Defendants' Opposing SMF ¶ 76. I disagree.  The plaintiff's statement fairly characterizes the relevant portion of the e-mail, which states: "I have no idea what kind of numbers of shares people are talking about (. . . right now, the seven of us each have fifty shares out of a total of 1,000 authorized), but I'm sure that everytime there's a request for annual personal financial statements or personal tax returns from the likes of Wells Fargo or FAME, this kind of discussion is going to take place. – I just didn't want you to be blind-sided by it, but I know that there've been some informal discussions going on around here of that ilk."  4/4/05 Bader e-Mail.  The parties disagree whether the e-mail was misleading, with the plaintiff asserting that it failed to reveal that, the month before, the Board had created the Guaranty Shares Formula, pursuant to which the exact number of shares in issue had been calculated, and the defendants pointing out that the e-mail referenced the potential issuance of additional shares in connection with two loans at a time when calculations had been performed only as to one.  *Compare* Plaintiff's SMF ¶ 77; 4/4/05 Bader e-Mail *with* Defendants' Opposing SMF ¶ 77; 4/4/05 Bader e-Mail; Bader Dep. at 135-36, 322.

[34] The parties dispute whether the plaintiff's telephonic attendance at the April 2005 meeting sufficed to inform him of the adoption of the Guaranty Shares Formula.  *Compare* Plaintiff's Opposing SMF ¶ 65; Baldwin Opp. Aff. ¶ 30; Plaintiff's SMF ¶ 56; Baldwin Aff. ¶ 19 *with* Defendants' Opposing SMF ¶ 56; Bader Aff. ¶¶ 64-65.

[35] The parties dispute whether, sometime in mid-2005, Bader sent the plaintiff another e-mail warning him that some of the other defendants were looking to "screw" him by diluting his shares.  *Compare* Plaintiff's SMF ¶ 82; Baldwin Aff. ¶ 22 *with* Defendants' Opposing SMF ¶ 82; Bader Opp. Aff. ¶ 25.  The defendants argue that the plaintiff's statement should be stricken pursuant to Local Rule 56(f) for failure to produce the underlying e-mail, *see* Defendants' Opposing SMF ¶ 82; however, the plaintiff does produce competent evidence in support of the statement in the form of his sworn

involved in its day-to-day operations, (ii) he was not regularly receiving in any consistent fashion, despite repeated requests for the same, financial statements or other data about WMI's condition and business or minutes of Board and shareholders' meetings (even when he was a member of the Board), and (iii) he did not know if the new lender would scrutinize WMI's financial condition with the same level of diligence that Wells Fargo had, with an eye toward making sure that WMI stayed in a financially stable condition, thereby reducing the chance that the guaranties would be called. Plaintiff's SMF ¶ 79; Baldwin Aff. ¶ 21.[36]

The 2005 AVCOG financing enabled WMI to keep its doors open during the summer of 2005 but did not solve WMI's primary problem of having limited access to working capital. Defendants' SMF ¶ 66; Plaintiff's Opposing SMF ¶ 66. As a result, WMI continued to incur losses. *Id.* ¶ 67. WMI's internal financial records showed that, by June 30, 2005, the company's liabilities exceeded the value of its assets by more than $753,203. *Id.* ¶ 68. By the beginning of August 2005, the company had $303,641 in accounts payable more than 60 days past due, $65,511 of which was more than 90 days past due. *Id.* ¶ 69. By August 2005, the company's liabilities exceeded the value of its assets by more than $846,000. *Id.* ¶ 70.

Fortunately, by August 2005, Bader was able to secure a commitment from ASB to provide approximately $3.6 million in financing to replace Wells Fargo as a lender ("2005 ASB Refinancing"). *Id.* ¶ 71. Based on WMI's financial information, the defendants concluded that WMI was facing a forced liquidation if it did not close on the 2005 ASB Refinancing and that the company had a negative forced-liquidation value in August 2005. *Id.* ¶ 72. Due to the urgency of

---

affidavit.  Accordingly, the objection is overruled.

[36] The defendants purport to deny this statement, but their denial is more in the nature of a qualification: that, whatever his reasons, the plaintiff did not share these reasons with them prior to the instant litigation.  Defendants' Opposing SMF ¶ 79; Bader Opp. Aff. ¶ 30.

closing quickly on the 2005 ASB Refinancing and due to its lack of cash, WMI lacked the time or the funds to hire any outside consultants to confirm these conclusions.  Defendants' SMF ¶ 73; Bader Aff. ¶ 83.[37]

ASB approved financing for WMI in 2005 because it determined that WMI was a company with excellent growth prospects and a bright future (*e.g.*, "The near future for [WMI] looks very bright due to new environmental regulations that require air pollution control system retrofits and upgrades on all power generation, refining and petrochemical plants.  It is estimated that over the next ten years there will be 1,135 projects totaling $495 to $915 million in damper sales to US coal fired utility plants as reported by McIlvane Company. . . .  I recommend this loan due to experienced management, strong future business prospects, strong collateral with agency guarantees and acceptable debt service coverage."  Plaintiff's SMF ¶ 84; Commercial Loan Proposal dated June 29, 2005 ("ASB Loan Proposal"), Exh. P thereto, at [5], [8].[38]  These statements were based on ASB's evaluation of WMI's potential for increased sales in the event it was able to obtain better access to working capital.  Defendants' Additional SMF ¶ 134; Plaintiff's Reply SMF ¶ 134.  They do not reflect ASB's evaluation of WMI's financial condition prior to the 2005 ASB Refinancing or a determination that WMI was fiscally sound prior to that refinancing.  *Id.* ¶ 135.  ASB's evaluation of WMI was based on the assumption that WMI would enjoy cash-flow improvements under the new lending facility.  *Id.*  It did not reflect an opinion as to WMI's financial condition in the absence of improved cash flow.  *Id.*

---

[37] The plaintiff purports to deny this statement, *see* Plaintiff's Opposing SMF ¶ 73,  but does not succeed in doing so inasmuch as he addresses the defendants' ability to hire outside consultants as of January 2006, not as of the time of the closing of the 2005 ASB Refinancing.

[38] The plaintiff further asserts that ASB knew by June 2005 that he would not be providing a guaranty.  Plaintiff's SMF ¶ 85.  I sustain the defendants' objection to this statement, *see* Defendants' Opposing SMF ¶ 85, on the ground that while the ASB Loan Proposal that the plaintiff cites for this proposition omits his name from the list of guarantors, *see* ASB

The 2005 ASB Refinancing consisted of loans in the amount of $1,627,500 and a line of credit in the amount of $2,000,000.  Defendants' SMF ¶ 74; Plaintiff's Opposing SMF ¶ 74. Because ASB was willing to lend based in part on progress billings, ASB offered WMI the possibility of indirectly borrowing against WIP and, in turn, the possibility of funding more and larger projects.  *Id*. ¶ 75.  ASB also offered other more favorable lending terms that greatly reduced the monthly charges to which WMI would be subject.  *Id*. ¶ 76.  Although the 2005 ASB Refinancing had a face value essentially equal to that of the Wells Fargo financing, it increased the exposure to guarantors because ASB's lending formula permitted WMI to draw on the full amount of the ASB line of credit.  *Id*. ¶ 78.[39]  This increased the importance to the defendants of having the risks associated with guaranties shared by all shareholders.  *Id*. ¶ 79.[40]

On August 10, 2005, Powell, who succeeded the plaintiff as president of WMI, sent the plaintiff a letter outlining the general terms of the 2005 ASB Refinancing and informing him that ASB was demanding personal guaranties and that, under the Guaranty Shares Formula, his equity would be diluted if he did not provide a guaranty.  *Id*. ¶ 80.  The Powell letter gave the plaintiff five business days within which to notify Powell whether he desired to guaranty the loans and receive a *pro rata* share of the guaranty shares.  Plaintiff's SMF ¶ 87; Letter dated August 10, 2005 from John Powell to Alexander G. Baldwin ("8/10/05 Powell Letter"), Exh. Q thereto.  The Powell letter was not accompanied by, and made no reference to, any information regarding the value of WMI shares,

---

Loan Proposal at [1], that does not *ipso facto* mean that ASB then "knew" he would not provide a guaranty.

[39] The plaintiff qualifies this statement, asserting that while the 2005 ASB Refinancing may have nominally increased the guarantors' liability, viewed another way, it reduced it inasmuch as the terms of that financing were much more favorable to WMI than those offered by the preexisting Wells Fargo lending facilities, which would decrease the risk that WMI would fail and the guaranties would be called.  Plaintiff's Opposing SMF ¶ 78.

[40] The plaintiff's objection to this paragraph on the basis that it constitutes thinly veiled argument, *see* Plaintiff's Opposing SMF ¶ 79, is overruled.

the value of collateral provided to ASB or the value or risk inherent in a guaranty of the 2005 ASB Refinancing.  Plaintiff's SMF ¶ 88; Baldwin Aff. ¶ 23; 8/10/05 Powell Letter.

The plaintiff responded by e-mail on August 11, 2005, claiming that he had not previously been informed that the Board had voted to issue shares as consideration for personal guaranties. Defendants' SMF ¶ 81; Plaintiff's Opposing SMF ¶ 81.  He expressed concern about being given five business days to decide whether to "deliver[] a guarantee to unknown lenders for unknown conditions for [WMI] whose results I have not been provided since I received the S Corporation Tax Return for the year ending December 4, 2004."  Plaintiff's SMF ¶ 89; Defendants' Opposing SMF ¶ 89.[41]  Bader, in turn, responded by e-mail on August 12, 2005, informing the plaintiff that it was critical for WMI to proceed with closing because of its dire financial situation and noting that the company had incurred losses of $392,000 since January 1, 2005.  Defendants' SMF ¶ 82; Plaintiff's Opposing SMF ¶ 82.  Bader's e-mail also stated that the issuance of any shares in connection with the 2005 ASB Refinancing could be delayed until the plaintiff had sufficient time to make an informed decision about whether to provide a guaranty.  *Id.* ¶ 83.

ASB originally determined that it would require personal guaranties from all WMI shareholders to secure the 2005 ASB Refinancing and advised Bader of that fact.  Defendants' Additional SMF ¶ 136; Plaintiff's Reply SMF ¶ 136.  After Bader informed ASB that WMI might not be able to secure a guaranty from the plaintiff, ASB's loan officer sought and received authority to close on the loan without a guaranty from the plaintiff.  *Id.* ¶ 137.  Each defendant did in fact provide an unlimited personal guaranty, and WMI closed on the 2005 ASB Refinancing on August 18, 2005. Defendants' SMF ¶ 85; Plaintiff's Opposing SMF ¶ 85.  The financing extinguished

---

[41] The defendants qualify this statement, asserting, *inter alia*, that the plaintiff was given any and all information he requested.  Defendants' Opposing SMF ¶ 89; Baldwin Dep. at 149-50; Bader Aff. ¶ 82.

WMI's prior debt and, in turn, all of the guaranties that each of the parties, including the plaintiff, had provided to prior lenders. *Id*. ¶ 86. The plaintiff cannot dispute that over the next several months, the defendants provided him with any and all documentation or other information he requested regarding the ASB financing and WMI's financial condition. Defendants' SMF ¶ 87; Bader Aff. ¶ 82.[42]

The defendants voted, as WMI's Board on October 12, 2005, to specifically authorize the issuance of shares in connection with the 2005 ASB Refinancing, even though the Guaranty Shares Formula adopted by the Board in March 2005 did not require such a vote. Defendants' Additional SMF ¶ 119; Plaintiff's Reply SMF ¶ 119. This vote authorized the issuance of an amount of shares that contemplated having seven rather than six guarantors. *Id*.[43]

According to Tumlin, the plaintiff stated on more than one occasion after August 2005 that he intended to provide a guaranty for the 2005 ASB Refinancing. Defendants' SMF ¶ 88; Plaintiff's Opposing SMF ¶ 88. He has testified that he "wouldn't be surprised if I said something like that." *Id*. ¶ 89. Based on the plaintiff's representations, Bader recalculated the distribution of shares to be issued in connection with the 2005 ASB Refinancing premised on having seven rather than six guarantors. *Id*. ¶ 90. However, at some point, according to his own testimony, the plaintiff opted to "ignore[] the process." *Id*. ¶ 91.[44] After the plaintiff ceased having contact with the defendants,

---

[42] The plaintiff does in fact purport to dispute this statement, asserting that the defendants failed to inform him that a component of the shares-for-guaranties transaction was the provision of additional funds by WMI to guarantors to cover the income tax implications of the issuance of the guaranty shares. Plaintiff's Opposing SMF ¶ 87; Baldwin Aff. ¶ 27. Nonetheless, he fails to make clear whether this omitted information fell within the scope of documentation or other information he requested. *Id*. He therefore falls short of effectively denying the underlying statement.

[43] The plaintiff qualifies this statement, asserting that, at the October 12, 2005 Board meeting, the defendants voted to issue up to 644 shares of WMI's stock, and while the vote contemplated the possibility of issuing enough stock to ensure the shares could be divided equally among seven guarantors (himself and the defendants), it did not definitively state that those shares would be issued in a specific amount. Plaintiff's Reply SMF ¶ 119; Exh. A thereto.

[44] The plaintiff qualifies this statement, asserting that in the second half of 2005 he was diagnosed with prostate cancer

Powell sent the plaintiff a letter on December 9, 2005 informing him that a deadline of December 31, 2005 had been set for him to decide whether he would provide a guaranty for the 2005 ASB Refinancing. *Id*. ¶ 92. The letter informed the plaintiff that guaranty shares would be distributed to all shareholder guarantors on a *pro rata* basis on December 31, 2005. Defendants' Additional SMF ¶ 142; Plaintiff's Reply SMF ¶ 142. The defendants did not hear from the plaintiff again in 2005. Defendants' SMF ¶ 93; Plaintiff's Opposing SMF ¶ 93.

On January 1, 2006, each defendant was issued 107 shares ("Initial Guaranty Shares") for having provided a personal guaranty in connection with the 2005 ASB Refinancing, diluting the plaintiff's equity interest from 14.28 percent to 5.04 percent. *Id*. ¶ 94.[45] On January 5, 2006, Tumlin sent the plaintiff an e-mail seeking clarification as to whether he intended to provide a guaranty for the 2005 ASB Refinancing, but the plaintiff did not provide a guaranty. *Id*. ¶ 95. The plaintiff declined to provide a guaranty for the 2005 ASB Refinancing for the same reasons he had declined to provide a guaranty of the AVCOG loan. Plaintiff's SMF ¶ 95; Baldwin Aff. ¶ 26.[46] The plaintiff's decision not to provide a guaranty (either as of the August 2005 closing or thereafter, when his deadline to participate expired on December 31, 2005) did not alter the terms of the 2005 ASB Refinancing in any substantive way. Plaintiff's SMF ¶ 93; Defendants' Opposing SMF ¶ 93.

The defendants claim that, if the plaintiff had provided a guaranty of the 2005 ASB Refinancing before the December 31 deadline, he would have been provided with a *pro rata* issue of shares with all of the defendants as calculated in accordance with the Guaranty Shares Formula. *Id*.

---

and also was dealing with a family crisis involving his sister, as a result of which he was extremely distracted and unable to focus on issues related to WMI as the December 31 deadline set by the defendants approached. Plaintiff's Opposing SMF ¶ 91; Baldwin Opp. Aff. ¶ 8.

[45] My recitation incorporates, in part, the plaintiff's qualification.

[46] The defendants purport to deny this statement, but their denial is more in the nature of a qualification: that, whatever his reasons, the plaintiff did not share these reasons prior to the instant litigation. Defendants' Opposing SMF ¶ 95;

¶ 98.  The defendants and WMI concede that, if the plaintiff had offered a guaranty of the 2005 ASB Refinancing and guaranty shares had been issued *pro rata* to him and the defendants accordingly, the end result would have been *status quo ante*, in that every shareholder would have maintained the same ownership interest in WMI following issuance of the guaranty shares as such shareholder had prior to issuance of those shares.  Plaintiff's SMF ¶ 99; Bader Dep. at 196-98.[47]

On January 19, 2006, the defendants, in their capacity as WMI directors, voted unanimously to issue to themselves 107 shares each of WMI common stock retroactive to January 1, 2006 in exchange for their August 2005 guaranties of the 2005 ASB Refinancing.  Plaintiff's SMF ¶ 100; Defendants' Opposing SMF ¶ 100.[48]  In calculating the number of shares to issue each director, the Board used the same Guaranty Shares Formula, without modification, first approved in March 2005 with respect to the proposed AVCOG loan.  *Id.* ¶ 101.  In total, 642 shares (107 for each of the six directors) were issued to the defendants in consideration of their providing guaranties of the 2005 ASB Refinancing.  *Id.* ¶ 102.  Prior to issuing themselves the Initial Guaranty Shares pursuant to the Guaranty Shares Formula, the defendants did not consult with Purdy Powers or any other independent person or consultant for the purpose of valuing the Initial Guaranty Shares as of the time of issuance or as of the time of the 2005 ASB Refinancing.  Plaintiff's SMF ¶ 104; Bader Dep.

---

Bader Opp. Aff. ¶ 30.

[47] The defendants object to this statement on the basis that it relies on testimony provided under objection and therefore is inadmissible for purposes of summary judgment.  Defendants' Opposing SMF ¶ 99.  The objection is overruled.  The underlying objection at deposition, as to the form of the question put to Bader, has no evident merit.  *See* Bader Dep. at 198.  The defendants also qualify the statement, asserting that full participation by all shareholders offered the benefit of spreading the risk of guaranties among all of them.  Defendants' Opposing SMF ¶ 99; Bader Dep. at 197-98.

[48] The defendants qualify this statement, asserting that the shares were issued consistent with the formula adopted in March 2005, that they voted again in October 2005 to issue up to 644 shares in connection with the 2005 ASB Refinancing, although they were not required to do so under the previously approved formula, and that the only reason that the number of shares was different than the 642 that ultimately issued was because the 644 figure contemplated the possibility that the plaintiff would provide a guaranty, in which event 644 shares would have issued to avoid fractional shares in a *pro rata* distribution to seven, rather than six, shareholders.  Defendants' Opposing SMF ¶ 100; Bader Opp.

at 182, 188.[49]   Between January 1, 2006 and the vote taken on January 19, 2006, the defendants

made no efforts to make any determination of the value of WMI's shares or the value of the

guaranties provided in August 2005 in connection with the 2005 ASB Refinancing.  Plaintiff's SMF

¶ 105; Bader Dep. at 263-64.[50]   At a May 15, 2006 WMI shareholders' meeting, the defendants, in

their capacities as WMI shareholders, unanimously ratified the decision to issue the Initial Guaranty

Shares to themselves.  Plaintiff's SMF ¶ 107; Defendants' Opposing SMF ¶ 107.  The plaintiff did

not cast a vote ratifying the issuance of the Initial Guaranty Shares; in fact, he was not present at the

shareholders' meeting at the time the vote was taken.  *Id.* ¶ 108.[51]

The provision of additional cash compensation to the shareholders who provided ASB

financing-related guaranties to cover the financing's tax implication was never discussed prior to the

issuance of the Initial Guaranty Shares, and the plaintiff was never offered such additional

compensation at any time.  Plaintiff's SMF ¶ 114; Baldwin Aff. ¶ 27.[52]   The defendants only

---

Aff. ¶ 6.

[49] The defendants deny this statement to the extent it suggests that they could have retained a valuation consultant, given that WMI had no cash to hire such a consultant in 2005.  Defendants' Opposing SMF ¶ 104; Bader Opp. Aff. ¶¶ 18, 24.

[50] I omit a portion of paragraph 105 asserting that the Board knew by January 1, 2006 that the plaintiff would not be providing a guaranty, *see* Plaintiff's SMF ¶ 105, which is not supported by the citation given.

[51] The plaintiff was present for a portion of this meeting by cell phone while driving, but thunderstorms and poor cell reception forced him to give up on participating because he was able to stay connected only for short periods of time. Defendants' Additional SMF ¶ 121; Plaintiff's Reply SMF ¶ 121; Bader Dep. at 172-73.  The parties dispute whether, following that meeting, the plaintiff ceased communicating with the defendants, as the defendants contend.  *Compare* Defendants' Additional SMF ¶ 122; Bader Opp. Aff. ¶ 11 *with* Plaintiff's Reply SMF ¶ 122; Affidavit of Alexander G. Baldwin in Support of His Reply to Defendants' Opposition to His Motion for Summary Judgment ("Baldwin Reply Aff."), attached to Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Plaintiff's Reply") (Docket No. 45), ¶ 4.  The plaintiff contends that he made repeated efforts after May 2006 to get in contact with Bader, but these efforts were unavailing as Bader would not accept the plaintiff's phone calls and never returned his messages.  Plaintiff's Reply SMF ¶ 122; Baldwin Reply Aff. ¶ 4.

[52] The plaintiff states that, in late 2006 or early 2007, Bader caused WMI to issue additional cash compensation to each defendant to cover the tax liability each had incurred as a result of issuance of the Initial Guaranty Shares.  Plaintiff's SMF ¶ 113.  I sustain the defendants' objection to this paragraph, *see* Defendants' Opposing SMF ¶ 113, on the basis that it is not fairly supported by the citation given.  The defendants deny paragraph 114 to the extent that it suggests they

considered the issue of bonuses upon the advice of WMI's accountants, which was provided in December 2006.  Defendants' Additional SMF ¶ 139; Plaintiff's Reply SMF ¶ 139.

WMI's 2005 Financial Statements, prepared by its auditing firm Purdy Powers, became available to the defendants on or about January 25, 2006.  Plaintiff's SMF ¶ 96; 2005 Financial Statements at 1.[53]  WMI's financial condition began to improve almost immediately after closing on the 2005 ASB Refinancing, and WMI managed to earn a profit in 2006.  Defendants' SMF ¶ 96; Plaintiff's Opposing SMF ¶ 96.  Because the financing opened the door for WMI to work on more and bigger projects, the company drew on almost all funds available under the ASB lending facilities within a year.  *Id*. ¶ 97.  For this reason, WMI sought to secure additional financing from ASB in the amount of $1,325,000.  *Id*. ¶ 98.[54]

---

withheld any information from the plaintiff.  Defendants' Opposing SMF ¶ 114.  They state that because WMI is an S corporation, the issuance of the Initial Guaranty Shares resulted in their realization of imputed income in 2006, and they first discussed the issue of bonuses to pay taxes on that imputed income based on advice of WMI's accountants given in December 2006.  Defendants' Opposing SMF ¶ 114; Bader. Opp. Aff. ¶¶ 21-22.  They point out that they therefore could not have discussed the issue in connection with the ASB refinancing that closed in August 2005.  *Id*.

[53] The parties draw differing conclusions as to WMI's state of health as of year-end 2005 based on the 2005 financial statements prepared by Purdy Powers.  The defendants point out that Purdy Powers determined that WMI's liabilities exceeded the value of its assets by $293,206 as of December 31, 2005 based on GAAP.  Defendants' Opposing SMF ¶ 96; 2005 Financial Statements at 3.  The plaintiff observes that Purdy Powers provided an estimated current fair market value of WMI stockholders' equity of $1,441,500 as of that time.  Plaintiff's SMF ¶ 96; 2005 Financial Statements at 3.  The defendants note that the figure relied on by the plaintiff is a "supplemental estimated current value" about which Purdy Powers states: "The supplementary [estimated current value] information . . . does not present financial position and results of operations in accordance with generally accepted accounting principles (GAAP).  Information prepared on an estimated current value basis is characterized by greater subjectivity and imprecision than conventional historical cost information.  In addition, the supplemental fair value financial statements do not purport to present the net realizable, liquidation, or market value of the Company as a whole.  Furthermore, amounts ultimately realized by the Company from the disposal of assets may vary significantly from the fair values presented."  Defendants' Opposing SMF ¶ 96; 2005 Financial Statements at 12.

[54] In 2006, WMI secured an additional loan from ASB in the amount of $500,000.  Defendants' Additional SMF ¶ 120; Plaintiff's Reply SMF ¶ 120.  Although the defendants provided personal guaranties for this loan and were entitled to additional guaranty shares, no shares issued because, due to the timing of the loan, the defendants were not able to give the plaintiff notice to participate.  *Id*.

41

In late 2006, the defendants, in their capacity as WMI's directors, voted unanimously to, *inter alia*, increase by $1,000,000 WMI's revolving line of credit with ASB and to increase a preexisting term loan by $100,000 ("2007 ASB Financing"). Plaintiff's SMF ¶ 115; Defendants' Opposing SMF ¶ 115. In consideration of the 2007 ASB Financing, ASB requested that WMI's shareholders (other than the plaintiff) provide additional guaranties. *Id*. ¶ 116. Both the 2005 and 2007 ASB financings were secured by first-priority mortgages and security interests in virtually all of WMI's real and personal property. *Id*. ¶ 117.

By letter dated December 26, 2006, the defendants advised the plaintiff that he would be required to guaranty the 2007 ASB Financing in order to receive his *pro rata* share of guaranty shares; as of that time, no vote of the Board had been taken to authorize the issuance of guaranty shares to the plaintiff or to any other director in connection with the 2007 ASB Financing. Plaintiff's SMF ¶ 118; Baldwin Aff. ¶ 28.[55]

On January 3, 2007, Tumlin spoke with the plaintiff's counsel, George Marcus, regarding certain events related to this action. Defendants' Additional SMF ¶ 125; Plaintiff's Reply SMF ¶ 125. In that conversation, Marcus informed Tumlin that the plaintiff had received notice from WMI inviting him to provide a guaranty for certain financing from ASB. *Id*. Although it was Tumlin's understanding that the requested documents had already been provided to the plaintiff by WMI, he provided Marcus with all of the documents requested, as well as an opportunity to review WMI's corporate record. *Id*. ¶ 126. Tumlin then met with Marcus at Tumlin's office the day before the closing was scheduled for the 2007 ASB Financing. *Id*. At that time, he told Marcus that WMI was preparing to close on the financing and asked if the plaintiff would be providing a guaranty. *Id*.

---

[55] The defendants deny this statement to the extent it suggests that the plaintiff or anyone else was required (as opposed to given an incentive) to provide guaranties to receive his shares. Defendants' Opposing SMF ¶ 118.

Marcus informed Tumlin that the plaintiff would not be providing a guaranty for the financing. *Id*. Marcus did not ask for any additional information or any additional time to review the information that already had been provided. *Id*. Tumlin relayed this information to WMI's Board the following day. *Id*.

The plaintiff declined to provide a guaranty in relation to the 2007 ASB Financing for the same reasons that he had refused to guaranty the AVCOG loan or the 2005 ASB Refinancing and because of the unfair way in which his shares had been diluted after the 2005 ASB Refinancing was consummated. Plaintiff's SMF ¶ 119; Baldwin Aff. ¶ 29.[56] The plaintiff's decision not to provide a guaranty did not prevent consummation of the 2007 ASB Financing in January 2007; nor did it result in any substantive changes to the terms of the same. Plaintiff's SMF ¶ 120; Defendants' Opposing SMF ¶ 120.

The 2007 ASB Financing closed on January 18, 2007. Defendants' SMF ¶ 98; Plaintiff's Opposing SMF ¶ 98. The timing of the closing was based solely on the need to secure access to working capital for WMI after the company had used the funds available under the ASB facility that closed in August 2005. Defendants' Additional SMF ¶ 127; Plaintiff's Reply SMF ¶ 127.[57] Once again, each of the defendants, but not the plaintiff, provided unlimited personal guaranties to secure this financing. Defendants' SMF ¶ 99; Plaintiff's Opposing SMF ¶ 99. Each defendant was then issued 91 shares as consideration for these guaranties. *Id*. ¶ 100. Because he did not participate, the plaintiff did not receive any shares, and his equity interest was diluted from 5.04 percent to 3.25

---

[56] The defendants purport to deny this statement, but their denial is more in the nature of a qualification: that, while the plaintiff shared his concerns as to the propriety and fairness of the issuance of stock as consideration of guaranties, he did not share with them until this litigation the other reasons he now gives for declining to guaranty the 2007 ASB Financing. Defendants' Opposing SMF ¶ 119; Bader Opp. Aff. ¶ 30.

[57] The plaintiff qualifies this statement, asserting that the reason WMI sought additional funds was that it was growing quickly, not because it was in any sort of financial *extremis*. Plaintiff's Reply SMF ¶ 127; Baldwin Reply Aff. ¶ 6.

percent. *Id.* ¶ 101.  Had the plaintiff provided a personal guaranty for the 2007 ASB Financing, his equity interest actually would have increased from 5.04 percent to 8.32 percent.  Defendants' Additional SMF ¶ 129; Plaintiff's Reply SMF ¶ 129.

On or about January 19, 2007, the Board met to discuss, *inter alia*, the issuance of additional guaranty shares; at that time, the defendants knew that the plaintiff had declined to provide a guaranty of the 2007 ASB Financing.  Plaintiff's SMF ¶ 121; Defendants' Opposing SMF ¶ 121.  On January 19, 2007, the defendants voted, in their capacity as WMI directors, to issue to themselves still more guaranty shares ("Additional Guaranty Shares") in relation to their guaranties of the 2007 ASB Financing.  *Id.* ¶ 122.  The Additional Guaranty Shares were issued pursuant to the Guaranty Shares Formula, and 546 of them were distributed on February 1, 2007.  *Id.* ¶ 123.[58]

On April 12, 2007, the defendants, in their capacity as six of the seven shareholders of WMI, ratified the issuance of the Additional Guaranty Shares by themselves in their capacity as WMI's directors.  *Id.* ¶ 126.  The plaintiff did not attend the April 12, 2007 shareholders' meeting and did not cast any votes related to the issues considered at that meeting.  *Id.* ¶ 127.[59]

On March 23, 2007, the plaintiff filed the instant one-count complaint in which he alleges that the defendants breached fiduciary duties they owed to him by issuing shares in connection with the 2005 and 2007 ASB financings and in which he seeks rescission of the two disputed transactions.

---

[58] The plaintiff further states that the defendants feel that the plaintiff's decisions not to provide guaranties for post-Wells Fargo corporate financing were unfair and gave the plaintiff a "free ride."  Plaintiff's SMF ¶ 129.  I sustain the defendants' objection to this statement on the ground that the plaintiff relies on deposition testimony of Bader that lacks any foundation to establish the state of mind of any other defendant.  *See* Defendants' Opposing SMF ¶ 129; Bader Dep. at 254-55.

[59] The plaintiff states that the defendants gave no thought to refining the Guaranty Shares Formula using additional information regarding WMI's financial condition to which they had access at the time.  Plaintiff's SMF ¶ 124.  I sustain the defendants' objection to this statement on the ground that the plaintiff relies on deposition testimony of Bader that lacks any foundation to establish the state of mind of any other defendant.  *See* Defendants' Opposing SMF ¶ 124; Bader Dep. at 285.

Defendants' SMF ¶ 102; Plaintiff's Opposing SMF ¶ 102.[60]  The plaintiff testified that he would not

have objected to the defendants having been compensated in cash for providing guaranties.  *Id.*

¶ 103.[61]

In support of his claims, the plaintiff has designated an expert, Mark Filler, to opine as to

WMI's value as of December 31, 2006 based on its value as a going concern and as to the value of

the guaranties the defendants provided to ASB.  *Id.* ¶ 105.  Filler's report indicates that the opinions

set forth therein are based on WMI's "fair value," which Filler defines as the "price at which

property would change hands between a willing buyer and a willing seller, neither being under a

compulsion to buy or sell."  *Id.* ¶ 106.  According to Filler, the fair market value of 100 percent of

the common stock of WMI as of December 31, 2006 was $3,915,000.  Plaintiff's SMF ¶ 130;

Designation of Expert Witness ("Filler Designation"), Exh. X thereto, at 1.[62]  According to Filler,

the dilution of the plaintiff's shares by issuance of the Initial Guaranty Shares and the Additional

Guaranty Shares damaged the plaintiff in the amount of $442,000, exclusive of attorney fees and

costs, based on the fair value of 100 percent of WMI's stock as of December 31, 2006.  Plaintiff's

SMF ¶ 131; Filler Designation at 1.[63]

---

[60] The plaintiff qualifies this statement, noting that the Complaint seeks relief aside from rescission.  Plaintiff's Opposing SMF ¶ 102; Complaint at 10.

[61] The plaintiff qualifies this statement, asserting that he does object that the way the defendants calculated and paid their compensation was unfair.  Plaintiff's Opposing SMF ¶ 103; Baldwin Opp. Aff. ¶ 9.

[62] The defendants dispute that this was in fact the fair market value of WMI as of December 31, 2006, offering the competing opinion of their expert, Gurley, that it was $3,952,478 as of that time.  Defendants' Opposing SMF ¶ 130; Affidavit of John T. Gurley in Support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion To Exclude Testimony of Defendants' Valuation Expert, John T. Gurley, and [for] Related Relief ("Gurley Aff."), Exh. A to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion To Exclude Testimony of Defendants' Valuation Expert, John T. Gurley, and [for] Related Relief (Docket No. 42), ¶¶ 14-15.

[63] The defendants take issue with Filler's methodology in valuing the plaintiff's damages as of December 31, 2006 but do not move to strike his testimony on that basis.  Defendants' Opposing SMF ¶ 131.  They further contend that their expert, Gurley, can establish that the plaintiff did not suffer any damages.  *Id.*  Gurley's relevant testimony is set forth below.

Filler was not designated to offer an opinion as to WMI's value for any other period of time or to offer an opinion as to WMI's forced-liquidation value at any period of time. Defendants' SMF ¶ 107; Plaintiff's Opposing SMF ¶ 107. Other than the defendants' opinion that WMI was facing a forced liquidation if it did not close on the AVCOG financing or the 2005 ASB Refinancing, there are no opinions in evidence as to whether WMI was facing a forced liquidation at any period of time. *Id.* ¶ 108. Other than the defendants' opinions of WMI's forced-liquidation value and Filler's fair-market-value opinions, the only other opinions in evidence as to WMI's value are opinions of value offered by the defendants' expert, Gurley, which are also premised on a fair-market-value approach. *Id.* ¶ 109.[64] Gurley has set the equity fair market value of WMI as of December 31, 2004 and December 31, 2005 at $1,495,834 and $1,908,393, respectively. Plaintiff's SMF ¶ 132; Defendants' Opposing SMF ¶ 132. Gurley has offered the opinion, based on his experience and training in business valuation, that any difference between the plaintiff's actual 2007 dilution and a hypothetical 2007 dilution under a fair-market-value analysis is reasonable in light of the imprecision that is implicit in the determination of fair market value of a closely held business. Defendants' Additional SMF ¶ 141; Plaintiff's Reply SMF ¶ 141.[65]

For insurance purposes, WMI also commissioned a valuation when funds became available to do so. Defendants' SMF ¶ 111; Plaintiff's Opposing SMF ¶ 111.[66] The defendants did not

---

[64] I sustain the plaintiff's objections to paragraph 110 and 112 of the Defendants' SMF, *see* Plaintiff's Opposing SMF ¶ 110, on the basis that they consist of experts' assessment of legal issues that are within the bailiwick of the court to resolve on summary judgment.

[65] In accordance with my ruling, above, on the plaintiff's motion to exclude Gurley's testimony concerning the value of the defendants' personal guaranties, I omit a portion of paragraph 141 touching on the value of the guaranties the defendants provided in 2005.

[66] This valuation was commissioned not only to assist in the acquisition of key-man life insurance policies but also to enable the defendants to solicit investment in WMI. Plaintiff's SMF ¶ 59; Bader Dep. at 83, 167-68. The defendants deny that the appraisal was solicited for the latter purpose on the basis that the plaintiff relies on deposition testimony provided under objection, which is therefore inadmissible on summary judgment. Defendants' Opposing SMF ¶ 59. The

commission their accounting firm, Purdy Powers, to conduct a valuation ("Purdy Powers Appraisal") until early 2006, after WMI had begun to reap the benefit of the 2005 ASB Refinancing and had cash available to commission a valuation. Defendants' Additional SMF ¶ 131; Bader Opp. Aff. ¶ 18.[67]  The Purdy Powers Appraisal, which was also based on a fair-market-value approach, was not available to the defendants or to WMI until at least the summer of 2006. Defendants' SMF ¶ 111; Plaintiff's Opposing SMF ¶ 111.[68]  However, the Purdy Powers Appraisal was available well prior to January 2007, when the defendants voted to issue themselves a second tranche of guaranty shares. Plaintiff's SMF ¶ 61; Defendants' Opposing SMF ¶ 61. The Purdy Powers Appraisal set the fair market value of 100 percent of the common equity interest in WMI at $2,470,000 as of December 31, 2005. *Id.* ¶ 109.  Until the defendants were supplied with the Purdy Powers Appraisal in the summer of 2006, they had no idea what the fair market value of WMI was. Plaintiff's SMF ¶ 110; Bader Dep. at 80-81.[69]  Neither the defendants nor WMI ever provided the plaintiff with a copy of the Purdy Powers Appraisal; he was not even aware of its existence until it was produced in discovery. Plaintiff's SMF ¶ 111; Baldwin Aff. ¶ 32.[70]

---

objection, which was made as to form, *see* Bader Dep. at 167-68, has no evident merit and is overruled.

[67] The plaintiff denies this statement on the basis that the 2004 and 2005 audited financial statements prepared by Purdy Powers at the defendants' request contained valuations of WMI's assets on both a GAAP and estimated-current-value basis. Plaintiff's Reply SMF ¶ 131. Nonetheless, he does not effectively dispute that the Purdy Powers Appraisal was not commissioned until early 2006. *Id.*

[68] The plaintiff qualifies this statement, asserting, *inter alia*, that the Purdy Powers Appraisal was provided to the defendants on or about June 16, 2006. Plaintiff's Opposing SMF ¶ 111; Valuation Report of Fair Market Value of the Common Stock of WahlcoMetroflex, Inc. as of December 31, 2005, Exh. L to Plaintiff's SMF, at 1.

[69] The defendants purport to deny this statement; however, they admit that they did not know the company's value under a fair-market-value analysis. Defendants' Opposing SMF ¶ 110. They point out that they had reached the conclusion that the company had a negative value under a forced-liquidation analysis. *Id.*

[70] The defendants' denial of this statement is more in the nature of a qualification: they assert that, through counsel, they provided all information that the plaintiff requested, and that they were denied the opportunity to provide any additional information the plaintiff deemed important when they were informed, through counsel, that he would not be participating in providing a guaranty of the 2007 ASB Financing. Defendants' Opposing SMF ¶ 111; Affidavit of Wayne Tumlin in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Tumlin Aff."), attached to

The 2004 Financial Statements were not available to the defendants until after the March 2005 Board meeting. Defendants' SMF ¶ 113; Plaintiff's Opposing SMF ¶ 113. WMI received them sometime in April 2005 or soon thereafter. Plaintiff's SMF ¶ 44; Defendants' Opposing SMF ¶ 44. The 2004 Financial Statements show that WMI's liabilities exceeded its assets by $454,693 as of December 31, 2004 based on GAAP. Defendants' SMF ¶ 114; Plaintiff's Opposing SMF ¶ 114. Those statements also show an estimated current value of the WMI stockholders' equity, in its entirety, of $970,100. Plaintiff's SMF ¶ 43; Defendants' Opposing SMF ¶ 43.[71] The 2004 Financial Statements provide, with respect to "estimated current value" figures contained therein:

> The supplementary [estimated current value] information . . . does not present financial position and results of operations in accordance with generally accepted accounting principles (GAAP). Information prepared on an estimated current value basis is characterized by greater subjectivity and imprecision than conventional historical cost information. In addition, the supplemental fair value financial statements do not purport to present the net realizable, liquidation, or market value of the Company as a whole. Furthermore, amounts ultimately realized by the Company from the disposal of assets may vary significantly from the fair values presented.

Defendants' SMF ¶ 115; 2004 Financial Statements at [12].[72]

Because the Predecessor Entities' assets were bought out of bankruptcy for a price that was less than their estimated value, the plaintiff and the defendants were instructed by their accountants, in accordance with GAAP, to record those assets, including the purchased real property (more than

---

Defendants' Opposing SMF, ¶¶ 4-6. They assert that the plaintiff did not make any further requests for information or additional time. Defendants' Opposing SMF ¶ 111; Tumlin Aff. ¶ 6.

[71] The defendants purport to deny this statement but admit that the figure of $970,100 was reported as a "supplementary estimated current value." Defendants' Opposing SMF ¶ 43.

[72] The parties dispute whether WMI was insolvent in 2004 and 2005. The plaintiff asserts that WMI was not insolvent in 2004 on an estimated-current-value basis because its assets of $4,160,600 exceeded its liabilities of $3,190,500, Plaintiff's Additional SMF ¶ 138; 2004 Financial Statements at 3-4, and it was not insolvent in 2005 on an estimated-current-value basis because its assets of $5,739,900 exceeded its liabilities of $4,298,400, Plaintiff's Additional SMF ¶ 139; 2005 Financial Statements at 2-3. The defendants deny that the corporation was solvent, stating that the estimated-current-value figures expressly did not represent value that could be realized in a liquidation and did not speak to WMI's ability to meet its current obligations as of the years in question. Defendants' Reply SMF ¶¶ 138-39; 2004

thirteen acres of commercial real estate), the plant (including an almost 51,000-square-foot manufacturing facility), equipment, and other long-term assets, as having a zero value on WMI's opening balance sheets and to value WMI's goodwill at a negative number; as a result, WMI's opening balance sheet did not purport to reflect the fair market valuation of WMI's assets. Plaintiff's Additional SMF ¶ 135; Baldwin Opp. Aff. ¶ 11.[73]

In generating the "estimated current values" of WMI's machinery, equipment, and office equipment provided in the 2004 and 2005 financial statements, WMI's outside accountants, Purdy Powers, used data derived from forced-liquidation analyses dated March 15, 2004 and April 20, 2005, respectively; those liquidation values for WMI's equipment and machinery were $338,500 in 2004 and $360,000 in 2005. Plaintiff's Additional SMF ¶ 136; 2004 Financial Statements at 3, [12]; 2005 Financial Statements at 2, 12.[74] In generating the "estimated current values" of WMI's land, buildings, and improvements in the 2004 and 2005 financial statements, Purdy Powers used data derived from brokers' opinions of value dated August 30, 2004 and May 5, 2005, respectively, and determined that the value of the land was $1,250,000 in 2004 and $1,650,000 in 2005. Plaintiff's Additional SMF ¶ 137; 2004 Financial Statements at 3, [12]; 2005 Financial Statements at 2, 12.[75] According to Purdy Powers, WMI had a positive net cash flow of $118,511 in 2004 and $33,969 in 2005. Plaintiff's Additional SMF ¶¶ 140-41; Defendants' Reply SMF ¶¶ 140-41.

---

Financial Statements at [12]; 2005 Financial Statements at 12.

[73] The defendants deny this statement to the extent it suggests that figures presented in the audited financial statements of WMI based on GAAP represented value that could have been realized in a forced liquidation. Defendants' Reply SMF ¶ 135; Affidavit of Seth Shields in Support of Defendants' Reply Memorandum ("Shields Aff."), attached thereto, ¶¶ 3-4. The GAAP figures in WMI's financial statements were based on a fair-market-value approach, not a forced-liquidation approach. *Id.*

[74] The defendants deny this statement to the extent it suggests that the "estimated current values" represented value that could be realized in a forced liquidation. Defendants' Reply SMF ¶ 136; Shields Aff. ¶¶ 3-4.

[75] The defendants deny paragraph 137 to the extent it suggests that "estimated current values" represented value that could be realized in a forced liquidation. Defendants' Reply SMF ¶ 137; Shields Aff. ¶¶ 3-4.

The initial financing used by WMI to purchase the Predecessor Entities' assets was provided by Wells Fargo and other entities in return for, among other things, liens on all of WMI's real and personal assets; after this financing was replaced by the initial ASB financing, ASB took security interests in all of WMI's real and personal assets. *Id.* ¶ 142.

In the balance sheets generated as part of the 2004 and 2005 financial statements prepared by Purdy Powers, the following items represent personally guaranteed liabilities (liabilities secured by WMI assets that were also secured by guaranties provided by all of the parties or the defendants): Current Liabilities/Line of Credit; Current Liabilities/Current Portion of Long-Term Debt; and Long-Term Liabilities/Long-Term Debt, Net of Current Portion. *Id.* ¶ 144. Similarly, on the internal Budget Variance Reports created by WMI itself, the following lines show personally guaranteed liabilities: Current Liabilities/Line of Credit; Other Accrued Liabilities/Maine Sales and Use Tax; Other Accrued Liabilities/Short Term Note – AVCOG; Other Accrued Liabilities/Short Term Note – BJ Investments; Long Term Debt – CEI; Long Term Debt – FAME; Long Term Debt – Wells Fargo M/E; Long Term Debt – Wells Fargo CAPEX; Long Term Debt – LAEGC; and Long Term Debt – AVCOG. *Id.* ¶ 145.

The 2004 Financial Statements show that the total amount of personally guaranteed liabilities as of December 31, 2004 was $1,801,863 on a GAAP basis and $1,914,400 using the estimated current value; they also show that the value of WMI's assets as of December 31, 2004 was $2,781,411 on a GAAP basis and $4,160,600 using estimated current values. Plaintiff's Additional SMF ¶ 146; Baldwin Opp. Aff. ¶ 19.[76] Therefore, according to Purdy Powers, as of December 31,

---

[76] The defendants deny paragraph 146 to the extent that it suggests that GAAP figures presented in WMI's audited financial statements represented value that could have been realized in a forced liquidation. Defendants' Reply SMF ¶ 146; Shields Aff. ¶¶ 3-4. Further, the defendants state that the 2004 Financial Statements do not show that ASB had the right, pursuant to the personal guaranties they had provided, to pursue them personally prior to, or in lieu of, seeking to

2004, if all personally guaranteed liabilities were satisfied in full out of corporate assets, thereby negating any guaranty exposure, WMI would still possess assets of $979,548 on a GAAP basis and $2,246,200 using estimated current values.  Plaintiff's Additional SMF ¶ 147; 2004 Financial Statements at 3-4; Baldwin Opp. Aff. ¶ 20.[77]

The WMI internal Budget Variance Report for December 31, 2004 shows that, as of that date, the total amount of personally guaranteed liabilities was $1,801,863, and WMI's total assets were $2,781,412.  Plaintiff's Additional SMF ¶ 148; Baldwin Opp. Aff. ¶ 21.  Therefore, according to WMI's own records, as of December 31, 2004, if all personally guaranteed liabilities were satisfied in full out of corporate assets, thereby negating any guaranty liability, WMI would still have assets of $979,549.  Plaintiff's Additional SMF ¶ 149; Baldwin Opp. Aff. ¶ 22.[78]  The WMI internal Budget Variance Report for June 30, 2005 shows that the total amount of personally

---

recover from corporate assets in a default, and the personal guaranties obligated them to pay all costs and expenses of collection, including attorney fees, in the event WMI defaulted on its obligations.  Defendants' Reply SMF ¶ 146; Bader Reply Aff. ¶ 4; Unlimited Guaranty, Exh. 1 thereto, §§ 3.2-3.4, 3.8, 7.1-7.1.2; Affidavit of Steven Boulet in Support of Defendants' Reply Memorandum, attached to Defendants' Reply SMF, ¶ 3; Unlimited Guaranty, Exh. 1 thereto, §§ 3.2-3.4, 3.8, 7.1-7.1.2; Affidavit of Michael Brousseau in Support of Defendants' Reply Memorandum, attached to Defendants' Reply SMF, ¶ 3; Unlimited Guaranty, Exh. 1 thereto, §§ 3.2-3.4, 3.8, 7.1-7.1.2; Affidavit of Scott Hall in Support of Defendants' Reply Memorandum, attached to Defendants' Reply SMF, ¶ 3; Unlimited Guaranty, Exh. 1 thereto, §§ 3.2-3.4, 3.8, 7.1-7.1.2; Affidavit of Roger Poulin in Support of Defendants' Reply Memorandum, attached to Defendants' Reply SMF, ¶ 3; Unlimited Guaranty, Exh. 1 thereto, §§ 3.2-3.4, 3.8, 7.1-7.1.2; Affidavit of John Powell in Support of Defendants' Reply Memorandum, attached to Defendants' Reply SMF, ¶ 3; Unlimited Guaranty, Exh. 1 thereto, §§ 3.2-3.4, 3.8, 7.1-7.1.2.

[77] The defendants deny paragraph 147 on the ground that the GAAP figures, which are based on a fair-market-value approach, do not represent value that could have been realized in a forced liquidation.  Defendants' Reply SMF ¶ 147; Shields Aff. ¶¶ 3-4.  They reiterate that (i) ASB had the right to pursue them personally prior to, or in lieu of, seeking to recover from corporate assets in a default, and (ii) the personal guaranties obligated them to pay all costs and expenses of collection, including attorney fees, in the event WMI defaulted on its obligations.  See n.76, above.

[78] The defendants object to, and alternatively deny, paragraphs 148 and 149 to the extent that they assume (but offer no foundation for) the proposition that WMI's assets would have realized 100 percent of their book value in a forced liquidation.  Defendants' Reply SMF ¶¶ 148-49.  The objection is overruled.  These paragraphs, as worded, do not proclaim that the personally guaranteed liabilities would be satisfied in full out of corporate assets; they posit that if they were, there would be assets left to spare based on the WMI figures.  The defendants' point is well-taken, but goes to the

guarantied liabilities as of June 30, 2005 was $1,920,753 and that WMI's total assets as of that date were $3,538,866. Plaintiff's Additional SMF ¶ 150; Baldwin Opp. Aff. ¶ 23. Therefore, according to WMI's own records, as of June 30, 2005, if all balance-sheet personally guarantied liabilities were satisfied in full out of corporate assets, thereby negating any guaranty liability, WMI would still have assets of $1,618,113. Plaintiff's Additional SMF ¶ 151; Baldwin Opp. Aff. ¶ 24.[79]

The 2005 Financial Statements show that the total amount of the personally guarantied liabilities as of December 31, 2005 was $1,799,394 on a GAAP basis and $1,799,400 using estimated current value; they also show that the value of WMI's assets as of December 31, 2005 was $4,127,543 on a GAAP basis and $5,739,900 using estimated current values. Plaintiff's Additional SMF ¶ 152; Baldwin Opp. Aff. ¶ 25.[80] Therefore, according to Purdy Powers, as of December 31, 2005, if all personally guarantied liabilities were satisfied in full out of corporate assets, thereby negating any guaranty liability, WMI would still have assets of $2,328,149 on a GAAP basis and $3,940,500 using estimated current values. Plaintiff's Additional SMF ¶ 153; Baldwin Opp. Aff. ¶ 26.[81]

---

weight, rather than the admissibility, of the statements.

[79] The defendants object to, and alternatively deny, paragraphs150 and 151 to the extent that they assume (but offer no foundation for) the proposition that WMI's assets would have realized 100 percent of their book value in a forced liquidation. Defendants' Reply SMF ¶¶ 150-51. The objection is overruled. As noted in the previous footnote, these paragraphs, as worded, do not proclaim that the personally guarantied liabilities would be satisfied in full out of corporate assets; they posit that if they were, there would be assets left to spare based on the WMI figures. The defendants' point is well-taken, but goes to the weight, rather than the admissibility, of the statements.

[80] The defendants deny paragraph 152 to the extent it suggests that the GAAP figures presented in WMI's audited financial statements represented value that could have been realized in a forced liquidation, given that the GAAP figures were based on a fair-market-value approach, not a forced-liquidation approach. Defendants' Reply SMF ¶ 152; Shields Aff. ¶¶ 3-4.

[81] The defendants deny paragraph 153, asserting that the GAAP figures, which were based on a fair-market-value approach, do not represent value that could have been realized in a forced liquidation. Defendants' Reply SMF ¶ 153; Shields Aff. ¶¶ 3-4. They reiterate that (i) ASB had the right to pursue them personally prior to, or in lieu of, seeking to recover from corporate assets in a default, and (ii) the personal guaranties obligated them to pay all costs and expenses of collection, including attorney fees, in the event WMI defaulted on its obligations. See n.76, above.

The 2004 Financial Statements show that, as of December 31, 2004, WMI had cash on hand of $196,286 on a GAAP basis and $196,200 on an estimated-current-value basis; the 2005 Financial Statements show that, as of December 31, 2005, WMI had cash on hand of $230,255 on a GAAP basis and $230,200 on an estimated-current-value basis.  Plaintiff's Additional SMF ¶ 158; 2004 Financial Statements at 3; 2005 Financial Statements at 2.[82]

## C.  Analysis

In his one-count complaint, the plaintiff alleges that the defendants' "self-dealing in issuing themselves the [Initial] Guaranty Shares and the Additional Guaranty Shares, thereby diluting [his] ownership interest in WMI, constituted a breach of their fiduciary duties, because the issuance of the [Initial] Guaranty Shares and the Additional Guaranty Shares was unreasonable, unfair, unjust and not done in good faith."  Complaint ¶ 52.  He asserts that issuance of both sets of shares "is null and void, because such shares have been issued in violation of the fiduciary duties of the Defendants as Directors of WMI."  *Id*. ¶ 53.  Further, he asserts that "[a]lternatively, as a direct and proximate result of Defendants' breach of their fiduciary duties, the value of [his] common stock interest in WMI had declined substantially, and [he] has been damaged thereby, in an amount[] to be determined at trial."  *Id*. ¶ 54.

The plaintiff seeks summary judgment as to both guaranty-share transactions on the grounds that (i) the defendants engaged in self-dealing, as a result of which, rather than being able to cloak themselves with the protections of the deferential "business judgment rule," they must prove the "entire fairness" of the challenged transactions, (ii) alternatively, even if the business judgment rule presumptively applies to those transactions, he rebuts that presumption by virtue of a showing of

---

[82] The defendants deny paragraph 158 to the extent it suggests that GAAP figures presented in WMI's audited financial statements represented value that could have been realized in a forced liquidation.  Defendants' Reply SMF ¶ 158;

breaches of the duties of care, loyalty, and/or good faith, as a result of which the defendants must prove the entire fairness of the transactions, and (iii) the defendants cannot meet their burden of proving that the issuance of either set of shares was entirely fair as a matter of either process or substance. *See* Plaintiff's Motion at 2-29. The plaintiff's bid for summary judgment as to damages is tied to his motion to exclude the testimony of the defendants' valuation expert, Gurley: he reasons that if Gurley's valuation testimony is either stricken or corrected in such a manner as to "essentially equal" that of his own expert, no material issue remains that his damages total at least $442,000. *See id.* at 30-31.

The defendants oppose the plaintiff's bid for summary judgment as to liability on the grounds that (i) as to both challenged transactions, the business judgment rule rather than the entire-fairness doctrine applies, and (ii) even if the entire-fairness standard governs, disputes as to material issues of fact preclude summary judgment. *See* Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Opposition") (Docket No. 40) at 10-29.[83] They contend that the plaintiff's bid for summary judgment as to damages founders inasmuch as he calculates them for the wrong time period. *See id.* at 30.

The defendants cross-move for partial summary judgment as to issuance of the Initial Guaranty Shares only, positing that (i) the business judgment rule applies, (ii) the plaintiff cannot establish breaches of the duties of either loyalty, good faith, or care, (iii) pursuant to the business judgment rule, they are entitled to judgment as a matter of law with respect to the Initial Guaranty Shares transaction, and (iv) even if they are required to prove the entire fairness of that transaction,

---

Shields Aff. ¶¶ 3-4.

[83] In their reply memorandum in support of their own motion for partial summary judgment, the defendants go so far as to argue that admissions made by the plaintiff entitle them to summary judgment even under entire-fairness scrutiny. *See* Reply Memorandum in Support of Defendants' Motion for Partial Summary Judgment ("Defendants' Reply") (Docket

they succeed as a matter of law in doing so.  *See* Defendants' Motion at 14-27; Defendants' Reply at 2-7.  The plaintiff opposes the defendants' cross-motion on the same bases he moves for summary judgment: that the defendants are obliged, by virtue of self-dealing and/or of breaches of the duties of care, loyalty, and/or good faith, to prove the entire fairness of the challenged transaction, which they cannot do.  *See* Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment ("Plaintiff's Opposition") (Docket No. 37) at 4-30.

The parties agree that Delaware law applies.  *See, e.g., id*. at 2; Defendants' Motion at 14 & n.5.  Their cross-motions implicate the following precepts:

1.    "The directors of Delaware corporations have a triad of primary fiduciary duties: due care, loyalty, and good faith."  *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001) (footnote omitted).

2    "Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."  *Cede & Co. v. Technicolor, Inc*. ("*Cede II*"), 634 A.2d 345, 361 (Del. 1993), *modified on other grounds*, 636 A.2d 956 (Del. 1994).  "Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."  *Id*. at 362; *see also, e.g., Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (defining self-dealing, inter alia, as receipt of a benefit by directors that does not "devolve[] upon the corporation or all stockholders generally").

---

No. 50) at 7 n.9.

3.      "The duty of the directors of a company to act on an informed basis . . . forms the duty of care element of the business judgment rule." *Cede II*, 634 A.2d at 367; *see also, e.g., In re Walt Disney Co. Derivative Litig.* ("*Disney IV*"), 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ("*Disney V*") ("The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent.") (citations, footnotes, and internal quotation marks omitted).  For these purposes, "gross negligence" has been defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (citations, footnotes, and internal quotation marks omitted).

In determining whether the duty of due care was fulfilled, a court is to "look for evidence as to whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989). Directors do not breach the duty of due care in rendering a decision that was "the product of *a process* that was *either* deliberately considered in good faith or was otherwise rational." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (emphasis in original); *see also, e.g., Disney IV*, 907 A.2d at 750 ("[W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests.") (emphasis in original).  A board of directors is "fully protected in relying in

good faith upon . . . information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees[.]"  Del. Code Ann. tit. 8, §141(e).

4.      "To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation."  *Disney IV*, 907 A.2d at 755.  The Delaware Supreme Court has identified "at least three different categories of fiduciary behavior [that] are candidates for the 'bad faith' pejorative label": (i) "so-called 'subjective bad faith,' that is, fiduciary conduct motivated by an actual intent to do harm[,]" (ii) conduct resulting from gross negligence (that is, lack of due care), although gross negligence alone is insufficient to demonstrate bad faith, and (iii) "intentional dereliction of duty, a conscious disregard for one's responsibilities[,]" such as intentionally acting with a purpose other than that of advancing the best interests of the corporation, acting with the intent to violate applicable positive law, and intentionally failing to act in the face of a known duty to act, thereby demonstrating conscious disregard for a director's duties.  *Disney V*, 906 A.2d at 64-67.  A plaintiff may establish a breach of the duty of good faith by proving that the directors engaged, *inter alia*, in actual or constructive fraud.  *See, e.g., Bennett v. Breuil Petroleum Corp.*, 99 A.2d 236, 240 (Del. Ch. 1953).  Constructive fraud, in turn, may be shown by a "grossly inadequate" stock price.  *See, e.g., id; Lewis v. Scotten Dillon Co.*, 306 A.2d 755, 757 (Del. Ch. 1973) ("excessive valuation, standing alone, [is] not enough unless it is so gross as to lead the Court to conclude that it was due, not to an honest error of judgment[,] but to bad faith or a reckless indifference to the rights of others").

5.      Directors of a corporation are presumed to have "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Aronson*, 473 A.2d at 812.  This presumption, known as the business judgment rule, "exists to protect and promote the full and free exercise of the managerial power granted to Delaware

directors[,]" *Smith v. Van Gorkom*, 448 A.2d 858, 872 (Del. 1985), *superseded by statute on other grounds as recognized in Berlin*, 787 A.2d 85, and "operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation[,]" *Cede II,* 634 A.2d at 360.

> 6.      As the Delaware Supreme Court has explained:

> The [business judgment] rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be attributed to any rational business purpose.  Thus, a shareholder plaintiff challenging a board decision has the burden at the outset to rebut the rule's presumption. To rebut the rule, a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached any one of the *triads* of their fiduciary duty – good faith, loyalty or due care.  If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments. If the rule is rebutted, the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the "entire fairness" of the transaction to the shareholder plaintiff.

*Id.* at 361 (citations and internal quotation marks omitted). [84]

---

[84] The plaintiff posits that self-dealing automatically renders the business judgment rule void *ab initio,* whereas absent self-dealing, presumptive application of the business judgment rule may be rebutted by a showing of breach of the duties of loyalty, due care, and/or good faith.  *See, e.g.*, Plaintiff's Motion at 3-4; Plaintiff's Opposition at 4.  The defendants take issue with this characterization of Delaware law, arguing that self-dealing is simply a species of breach of the duty of loyalty, which a plaintiff must prove to rebut the presumption of the business judgment rule.  *See, e.g.*, Defendants' Opposition at 11; Defendants' Reply at 2 n.1.  As a practical matter, nothing turns on the spat: whether the business judgment rule is deemed void *ab initio* or characterized as having initially attached only to have been rebutted, the end result is the same – the defendant directors must prove the entire fairness of the challenged transaction.  Presumably, the plaintiff does not take issue with the notion that, in either scenario, a plaintiff shareholder retains the burden of proving, at the least, the existence of facts sufficient to warrant characterization of directors' conduct as self-dealing.  To the extent it is necessary to resolve the dispute, I side with the defendants, whose interpretation appears more faithful to Delaware law.  *See, e.g., Cede II,* 634 A.2d at 364 ("This Court has generally and consistently refrained from adopting a bright-line rule for determining when a director's breach of duty of independence though self-interest translates into evidence sufficient to rebut the business judgment presumption accorded board action."); *Globis Partners, L.P. v. Plumtree Software, Inc.*, Civil Action No. 1577-VCP, 2007 WL 4292024, at *4 (Del. Ch. Nov. 30, 2007) ("The burden is on the party challenging the decision to establish facts rebutting the presumption [of application of the business judgment rule].  The party must allege facts creating a reasonable doubt that (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.") (footnotes and citations omitted); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 114 (Del. Ch. 1999) ("Gray's undisclosed, buy-side interest in the Transactions is a classic case of self-dealing. . . . [P]roof of such *undisclosed* self-dealing, in itself, is sufficient to rebut the presumption of the business judgment rule and invoke entire fairness review.") (emphasis in original).

7.      If a shareholder plaintiff rebuts the presumption of application of the business judgment rule, the burden shifts to the defendant directors to prove the entire fairness of the challenged transaction to the corporation and its shareholders – a showing that has both procedural and substantive components:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness. However, in a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger.

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (citations omitted); *see also Disney IV*, 907 A.2d at 747.

## 1. Issuance of Initial Guaranty Shares

The parties cross-move for summary judgment as to liability, and the plaintiff moves for summary judgment as to damages, with respect to the issuance of the Initial Guaranty Shares. *See generally* Plaintiff's Motion; Defendants' Motion. I agree with the defendants that, as concerns issuance of the first tranche of shares, no reasonable trier of fact could discern from the facts cognizable on summary judgment breaches of the duties of loyalty, care, or good faith on their part. The defendants accordingly are entitled to summary judgment in their favor as to that transaction.

### a. Duty of Loyalty

As a threshold matter, the defendants contend that they engaged in no self-dealing in voting to issue the Initial Guaranty Shares inasmuch as they merely received a benefit that was made available to all shareholders on equal terms. *See* Defendants' Motion at 16-21 (citing, *inter alia*,

*Williams v. 5300 Columbia Pike Corp.*, 901 F. Supp. 208, 211-12 (E.D. Va. 1995), *aff'd*, 103 F.3d

122 (4th Cir. 1996) (interpreting Delaware law); *Long v. Lampton*, 922 S.W.2d 692 (Ark. 1996);

*Gilbert v. El Paso Co.*, 575 A.2d 1131, 1146 (Del. 1990); *Bennett*, 99 A.2d at 239; *H-M Wexford*

*LLC v. Encorp, Inc.*, 832 A.2d 129, 148, 150 (Del. Ch. 2003); *Shields v. Shields*, 498 A.2d 161, 170

(Del. Ch. 1985)).  The defendants are correct that a director/shareholder who stands to benefit from a

stock-offer plan or other corporate scheme does not engage in self-dealing when all shareholders are

afforded the right to participate on equal terms in the transaction.  *See, e.g., Williams*, 901 F.

Supp.2d at 211-12 (directors' awareness of possibility that some unidentified shareholders would not

qualify for financing to take advantage of condominium-conversion plan did not establish that

directors acted fraudulently or that their interests were in conflict with those of any of the

shareholders; "The conversion plan was offered to all shareholders equally with the hope that all

would participate."); *Lampton*, 922 S.W.2d at 696, 699 (no self-dealing in case in which all

shareholders had right to purchase, for 10 cents per share, one additional share per each dollar in

letters of credit shareholder had placed with Bank of Boston on behalf of company); *Gilbert*, 575

A.2d at 1133, 1146 (no self-dealing in directors' renegotiation of hostile tender offer that allegedly

impaired rights of shareholders who had tendered shares in response to original offer when "no

board member received any special benefit which was not also extended to all shareholders");

*Bennett*, 99 A.2d at 239 (with respect to offer to shareholders to purchase additional shares *pro rata*

in order to relieve corporation's critical financial condition by raising capital, controlling

stockholder was not "on both sides of the transaction in the sense that he ha[d] an adverse personal

interest") (citations and internal quotation marks omitted); *Wexford*, 832 A.2d at 150 (minority

shareholder's "decision not to participate" in offer of shares in exchange for settlement of claims

"cannot, as a matter of law, taint with self-interest the Board of Directors' decision to authorize the

[share-offer proposal] and to effectuate the settlement on the terms proposed therein"); *Shields*, 498 A.2d at 170 (no self-dealing on part of board member in recommending merger because while board member, as stockholder, would benefit from effectuation of merger, "he would not do so in a way different from other shareholders or to the detriment of the corporation").

The plaintiff rejoins that the defendants' scheme is distinguishable in its purpose and effect from those involved in the cited cases because the defendants knew that only they could benefit from the guaranty-shares scheme. *See* Plaintiff's Opposition at 10. This is so, he posits, inasmuch as:

1.      Prior to January 2006 and January 2007, the Board never voted to authorize issuance of guaranty shares on account of the defendants' guaranties of the two ASB loans. *See* Plaintiff's Motion at 8. Although the plaintiff had been offered the opportunity to guaranty the ASB loans and to receive guaranty shares prior to those votes, which he declined to do, the offers were made by officers of WMI, not pursuant to or following a Board vote specifically authorizing the issuance of a set number of guaranty shares in consideration for providing guaranties for specific ASB financings. *See id*.

2.      Thus, on the two occasions on which the defendants, in their capacity as the entirety of the WMI Board, met to authorize issuance of guaranty shares, they knew that the plaintiff was not going to provide guaranties and therefore knew that they (the defendants) would be the only recipients of the shares. *See id*. Accordingly, they knew they were voting on a transaction that would provide them with a benefit that would not devolve upon shareholders generally. *See id*.

3.      While the defendants claim that they would have issued the plaintiff a *pro rata* share of the guaranty shares if he had provided guaranties, that is not obvious given that, if the plaintiff had participated, the defendants would have received no meaningful compensation inasmuch as each

61

would have had the same percentage of stock ownership as before issuance of the guaranty shares. *See id*. at 9.

4.     In any event, regardless of when the transactions were undertaken or voted upon, the structure of the guaranty-shares scheme itself reveals that it was nothing but a self-dealing scheme devised by the defendants to dilute the plaintiff's ownership if, as was his right, he chose not to provide a guaranty. *See id*. at 10.   There was no scenario in which the plaintiff could benefit: if he chose to provide a guaranty, he would have ended up with the same share ownership as before (and, thus, no true compensation), while if he chose not to provide a guaranty, he would be penalized by dilution of his share ownership. *See id*. at 10-11.  Inasmuch as the defendants were the only persons who could have benefited from the scheme, it meets the criteria of Delaware law for self-interested director action.  *See id*. at 11.

These arguments fall short, however, for these reasons:

1.     What matters, for purposes of assessing whether a transaction is self-dealing, is whether the offer to participate in the transaction was made on equal terms to all shareholders.  *See, e.g., Williams*, 901 F. Supp.2d at 211-12; *Lampton*, 922 S.W.2d at 699; *Gilbert*, 575 A.2d at 1146; *Bennett*, 99 A.2d at 239; *Wexford*, 832 A.2d at 150; *Shields*, 498 A.2d at 170.  The defendant was afforded the opportunity to participate in both the 2005 and 2007 guaranty-share transactions.  While individual directors may have made him those offers, there is no reason to doubt that the offers were *bona fide*, and were extended in accordance with the March 2005 Board vote authorizing issuance of guaranty shares pursuant to a fixed formula, not only with respect to the AVCOG loan but also with respect to any future financing.  *See* Defendants' SMF ¶ 59; Plaintiff's Opposing SMF ¶ 59.

2.     At the time the Guaranty Shares Formula was devised, and when offers were extended to the plaintiff to participate in both the 2005 and 2007 tranches of guaranty shares, the

defendants did not know whether the plaintiff would accept such offers. *See, e.g., id*. ¶¶ 88-89; Plaintiff's SMF ¶ 118; Baldwin Aff. ¶ 28; Defendants' Additional SMF ¶¶ 125-26; Plaintiff's Reply SMF ¶¶ 125-26. It is immaterial that, when all was said and done and the plaintiff had made his intentions clear, the defendants, in their capacity as directors, ratified issuance of guaranty shares only to themselves. The Board votes of January 19, 2006 and January 19, 2007 were not votes to extend offers to shareholders, but rather votes to ratify or authorize issuance of shares to those who had elected to participate by executing guaranties. *See, e.g.*, Plaintiff's SMF ¶¶ 100, 121-23; Defendants' Opposing SMF ¶¶ 100, 121-23.

3.       Ironically, the plaintiff characterizes the defendants' evidence that WMI would indeed have issued him *pro rata* shares if he had provided guaranties as "speculation." Plaintiff's Motion at 9. However, the only evidence touching on this subject is that, if the plaintiff had accepted the offers, he would have received guaranty shares. *See, e.g*., Defendants' Additional SMF ¶ 129; Plaintiff's Reply SMF ¶ 129; Plaintiff's SMF ¶ 98; Defendants' Opposing SMF ¶ 98. It is the plaintiff's argument that is speculative.

4.       The cognizable evidence, as a whole, reveals that the guaranty-shares scheme was not devised to punish the plaintiff but rather to save the corporation, of which he remained a shareholder. Three shareholders, Brousseau, Poulin and Boulet, were balking at providing personal guaranties for the then-struggling WMI in the absence of consideration or equal risk-sharing. *See, e.g.*, Defendants' SMF ¶¶ 28, 32-33; Plaintiff's Opposing SMF ¶¶ 28, 32-33. Both AVCOG and ASB initially required personal guaranties from all of WMI's shareholders. *See, e.g., id*. ¶ 31; Defendants' Additional SMF ¶ 136; Plaintiff's Reply SMF ¶ 136. While AVCOG and ASB were willing to overlook the absence of a guaranty from one shareholder (the plaintiff), there is no evidence that they would have been willing to press forward with the financing packages ultimately

provided, if two, three, or four shareholders had balked at providing personal guaranties.  The parties

debate whether, in the absence of the AVCOG financing, WMI would have met an early demise,

*compare, e.g.*, Defendants' SMF ¶ 29 *with* Plaintiff's Opposing SMF ¶ 29; however, the plaintiff

does not dispute that WMI would have had to lay off workers and even possibly temporarily cease

operations, *see, e.g., id.* ¶¶ 28-29, and it is fair to say the company's future was then in serious

doubt.  In the face of these hard realities, the WMI Board made a reasonable decision to offer

compensation to shareholders as incentive for them to provide personal guaranties.  The corporation,

which in some weeks had barely made payroll, was not then in a position to offer cash incentives.

*See, e.g., id.* ¶¶ 37, 49.  So the Board elected, with the benefit of advice from counsel, to offer shares

in exchange for guaranties.  *See, e.g., id.* ¶ 39; Defendants' Additional SMF ¶ 130; Plaintiff's Reply

SMF ¶ 130.

While it is true that the share-guaranty scheme was a potential wash in the sense that, had all

shareholders participated, all would have retained the same percentage of share ownership as before,

*see, e.g.*, Plaintiff's SMF ¶ 99; Bader Dep. at 196-98, that does not mean that it promised no benefit

to the plaintiff under any scenario, or to the defendants unless the plaintiff elected not to provide a

guaranty.  Rather, it assured all seven shareholders (including those balking at providing personal

guaranties) that all shareholders would share equally in the risk of providing such guaranties or, if

not, those who did step up to the plate would be rewarded by the provision of a greater percentage of

share ownership than those who did not.  In addition, in a larger sense, the scheme benefited all

shareholders in that it increased the likelihood that a sufficient number would provide guaranties to

enable WMI to obtain favorable refinancing, thereby shoring up its corporate health and, in turn, its

value to its shareholders.  It was for the plaintiff – and indeed for all seven shareholders – to decide

whether the risks of providing personal guaranties outweighed the benefits, which included avoidance of dilution of WMI share ownership.

In sum, the plaintiff was afforded a chance to participate on equal terms in the transactions at issue.  His "decision not to participate cannot, as a matter of law, taint with self-interest" the defendants' participation.  *Wexford*, 832 A.2d at 150.[85]

For these reasons, there is no triable issue of fact concerning whether, with respect to the Initial Guaranty Shares issuance, the defendants breached their duty of loyalty toward the plaintiff. It is clear that they did not.

### b.  Duty of Due Care

The plaintiff posits that, with respect to the issuance of the Initial Guaranty Shares, the defendants were grossly negligent both in the design of the Guaranty Shares Formula adopted in March 2005 and in their failure to update that formula based on substantial and material information that became available to them prior to January 2006.  *See* Plaintiff's Motion at 18.  This is so, he argues, because:

---

[85] The plaintiff asserts that "[p]erhaps the most damning fact to come out in discovery was that Defendants concealed the existence of the [Guaranty Shares] Formula from [him] for months."  Plaintiff's Motion at 13 n.6.  He points to Bader's April 2005 e-mail to him mentioning "informal discussions" about the possibility of provision of shares in exchange for guaranties but omitting any reference to the March 2005 Board vote formally authorizing issuance of guaranty shares. *See id.*  He argues: "Given the directors' duty of loyalty to their shareholders, this failure to disclose an extremely important step to the sole shareholder who was not privy to the negotiations is a clear breach of Defendants' fiduciary duties." *Id.*  Yet the plaintiff fails to illuminate the link, if any, between Bader's assertedly misleading e-mail and the two challenged guaranty-share transactions.  From all that appears, there was none.  No shares were issued in connection with the AVCOG financing after counsel advised that the plaintiff had been afforded an insufficient opportunity to consider the guaranty-shares offer. *See* Defendants' SMF ¶ 62; Plaintiff's Opposing SMF ¶ 62.  The plaintiff does not claim that he was ignorant of the Guaranty Shares Formula before deadlines expired for him to decide whether to participate in the challenged transactions.  He was afforded adequate time to consider whether to participate and to request information. *See, e.g., id.* ¶¶ 83, 92; Defendants' SMF ¶ 87; Bader Aff. ¶ 82; Defendants' Additional SMF ¶¶ 125-26; Plaintiff's Reply SMF ¶¶ 125-26.

1.      The defendants' determination in March 2005 that the corporation was completely under water and its shares therefore were valueless was nothing more than uninformed speculation. *See id*. at 15.  Although the defendants were "clueless" as to the fair market value of WMI, they hired no outside consultant to assist them with valuation at that time.  *See id*.

2.      At about the same time, they commissioned the Purdy Powers Appraisal, but did not await its outcome before devising the Guaranty Shares Formula.  *See id*.

3.      To the extent that the defendants relied on their willingness to offer CEI a 10 percent share in WMI for an investment of $200,000 as a benchmark for the Guaranty Shares Formula, that reliance was misplaced.  *See id*. at 16.   The negotiations with Henshaw went nowhere and never yielded any opinions of value or offers from either Henshaw or the defendants that would shed light on the value of WMI.  *See id*.  Neither Henshaw nor CEI offered a purchase price for the shares, and WMI did not propose a sale price to either of them.  *See id*.  In any event, it was logically inconsistent to maintain, on the one hand, that the shares were valueless yet posit that an independent party such as CEI would be willing to acquire corporate shares at some favorable price. *See id*.

4.      To the extent the formula was devised simply to give reluctant shareholders what they wanted, that hardly constitutes due care.  *See id*. at 17.  If an outside party had offered to provide a personal guaranty in exchange for that share of equity, the defendants would not have acquiesced solely because that was what the party wanted.  *See id*.

5.      The defendants undertook no effort to assess the value to the corporation of their providing personal guaranties of WMI's debt.  *See id*.  Even if one knew the value of the stock, one could not determine how much of it to issue in exchange for guaranties unless one assessed the value of the guaranties.  *See id*. at 17-18.  Such an analysis, in the plaintiff's view, clearly involves an

assessment of the risk of the loans being called, the value in liquidation of the collateral for the loans, and the likelihood that there would be a shortfall. *See id.* at 18.

6.     As of January 2006, when the Board authorized issuance of the first tranche of guaranty shares, the defendants had access to WMI's 2004 Financial Statements, which became available in April 2005 and revealed a fair market value for WMI as of year-end 2004 of $970,100. *See id.* at 19.  In addition, the very fact that ASB agreed to enter into a substantial financing arrangement with WMI indicated that WMI was not a company teetering on the brink of oblivion; indeed, ASB was bullish about WMI, noting that its future looked "very bright."  *Id.*

7.     The defendants did not wait for release of WMI's 2005 audited financial statements on or about January 25, 2006, approximately one week after the January 19, 2006 Board vote, or await the Purdy Powers Appraisal. *See id.* at 20 n.10.

Despite these arguments, the cognizable evidence makes clear that the defendants exercised due care in the circumstances presented, both in devising the Guaranty Shares Formula and in implementing it with respect to the issuance of the Initial Guaranty Shares.  The defendants argue, and the record supports, that they considered information reasonably available to them in March 2005 to reach the conclusion that the liquidation value of the corporation's shares then was zero, including Bader's advice as chief financial officer (based on his review of all of WMI's internal financial information and audited financial statements) and their own review of WMI's financial information.  *See* Defendants' SMF ¶¶ 42-44; Plaintiff's Opposing SMF ¶¶ 42-44.

WMI's financial records showed that, in addition to net losses incurred by year-end 2004, the company lost $127,237 during the first two months of 2005.  *See id.* ¶ 45.  In March 2005, the company was unable to meet its current obligations.  *See id.* ¶ 47.  As of March 4, 2005, it had $455,191 in accounts payable that were more than 60 days past due, $118,514 of which was more

than 90 days past due, and, as of March 2005, was able to make payroll by less than $100 on more than one occasion even though the defendants had all taken pay cuts to help make ends meet.  *See id.* ¶¶ 48-49.  WMI's internal financial records also showed that the company's liabilities exceeded the value of its assets by more than $413,415 as of year-end 2004.  *See id.* ¶ 50.  By March 2005, WMI's liabilities exceeded the value of its assets by more than $580,000.  *See id.* ¶ 51.  Based on this information, the defendants determined that WMI would be subject to a forced liquidation if it did not close on the AVCOG financing and that all shareholders would be subject to personal liability in such an event.  *See id.* ¶ 52.

"Liquidation value is appropriate . . . if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic."  *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 131 (Bankr. D. Mass. 1989).  Information available to the defendants in March 2005 and August 2005 indicated that WMI was insolvent.  *See, e.g., Siple v. Corbett*, Civil Action Nos. 6360, 6731, 1983 WL 17981, at *8 (Del. Ch. Oct. 17, 1983) (corporation is insolvent when, *inter alia*, it is unable to meet current obligations as they come due).

In addition, the defendants reasonably considered the cautionary example of Dumont, a fellow Maine-based company with assets similar to those of WMI that received pennies on the dollar in a forced liquidation.  *See* Defendants' SMF ¶¶ 53-55; Plaintiff's Opposing SMF ¶¶ 53-55.[86]  In

---

[86] The plaintiff argues that any reliance by the defendants on a comparison between WMI and Dumont provides more damning evidence of their gross negligence, rather than exonerating them, since: (i) while both companies were engaged in engineered-to-order metal fabrication and both were based in Maine, Dumont made products to order rather than engineering them as WMI does (a point that the defendants dispute, *compare* Plaintiff's Additional SMF ¶ 155 *with* Defendants' Reply SMF ¶ 155), (ii) the Dumont liquidation occurred in 2001, at least four years before the relevant events in this case (the defendants say it occurred in 2002, *compare* Plaintiff's Additional SMF ¶ 154 *with* Defendants' Reply SMF ¶ 154), (iii) and the defendants have no idea whether Dumont had any secured debt, whether it was guarantied and whether its guarantied debt was satisfied in the liquidation.  *See* Plaintiff's Opposition at 20-21. Nonetheless, the defendants simply make the point, which is undisputed, that Dumont had assets similar to those of WMI for which it received "pennies on the dollar" in liquidation.  *See* Defendants' SMF ¶¶ 53-55; Plaintiff's Opposing SMF ¶¶ 53-55.  While, as the plaintiff notes, "pennies on the dollar" technically could mean anything from two cents to 99 cents, *see* Plaintiff's Opposition at 20 n.20, the import of the phrase is that Dumont's assets fetched a price significantly

all, the defendants rationally took a dim view, based on information readily available to them, of the value of WMI's shares, concluding they were then worthless.

The defendants concede that they did not have a clue as to the corporation's fair market value during the period leading up to issuance of the Initial Guaranty Shares, *see, e.g.*, Defendants' Additional SMF ¶ 140; however, that is understandable.[87]   WMI is and was a closely held corporation, owned by a total of seven individuals.  *See, e.g.*, Defendants' SMF ¶¶ 9-10, 14; Plaintiff's Opposing SMF ¶¶ 9-10, 14.  Despite great effort in 2003 and 2004, the plaintiff and the defendants had been unable to find a buyer for the corporation.  *See, e.g., id.* ¶¶ 19-21.  While there had been negotiations with Henshaw about the possibility of CEI investing in WMI, those negotiations went nowhere and resulted in no concrete offer by either party to the other.  *See, e.g., id.* ¶¶ 66-70.  There was no experiential basis from which to deduce the price that a willing buyer would be willing to pay, and a willing seller (WMI) would be willing to accept, for shares of WMI stock.  What is more, in 2005, the corporation could not afford to hire an outside consultant to conduct a fair market valuation: for much of the year, it was struggling to survive.  *See, e.g.*, Defendants' Additional SMF ¶ 131; Bader Opp. Aff. ¶¶ 18, 24; Defendants' SMF ¶ 96; Plaintiff's Opposing SMF ¶ 96.  In any event, outside valuation studies are not essential to support informed business judgments, and fairness opinions by independent investment bankers are not required as a matter of law.  *See, e.g., Van Gorkom*, 488 A.2d at 876.

---

below their value.  Although the defendants undertook no detailed analysis of the Dumont liquidation, which had occurred four years earlier, and therefore could not reasonably have placed any great reliance upon it, they cannot be faulted for viewing it as a cautionary tale, an exemplar adding, however slightly, to the overall weight of the conclusion that WMI had a negative liquidation value.

[87] "Fair market value" is "[t]he amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." Black's Law Dictionary 597 (6th ed. 1990).  "Liquidation price" is "[a] price paid for property sold to liquidate a debt" and is "[u]sually less than market value since there is pressure to sell or a forced sale, either of which does not usually bring the highest price."  *Id.* at 931.

Nor can the defendants fairly be criticized, on a due-care basis, for placing great weight on the fact that the guaranty-share scheme ultimately adopted would satisfy shareholders who had balked at giving personal guaranties in the absence of an incentive. The defendants make a forceful showing that the AVCOG and ASB refinancings were critical to the health, if not the very survival, of the corporation. *See, e.g.*, Defendants' SMF ¶¶ 13-21, 25-39, 66-72, 75-76; Plaintiff's Opposing SMF ¶¶ 13-21, 25-39, 66-72, 75-76. It is undisputed that (i) AVCOG and ASB initially demanded guaranties from all shareholders, *see id.* ¶ 31; Defendants' Additional SMF ¶ 136; Plaintiff's Reply SMF ¶ 136, (ii) none of the shareholders was under any obligation to provide a personal guaranty, *see* Plaintiff's SMF ¶ 22; Defendants' Opposing SMF ¶ 22, (iii) three shareholders became unwilling in 2005 to do so without an incentive, *see* Defendants' SMF ¶ 32; Plaintiff's Opposing SMF ¶ 32, and (iv) WMI's counsel advised that the cash-strapped corporation could issue shares as compensation for the provision of guaranties, *see id.* ¶ 39. If the balking shareholders had not been induced to provide guaranties, all might have been lost. Assuring their participation was critical. Further, as the defendants point out, the formula that the recalcitrant shareholders found acceptable did not come out of thin air: it was based on the amount of shares the defendants had been willing to offer a potential third-party investor, CEI. *See* Defendants' Opposition at 20-21; *see also* Defendants' SMF ¶¶ 56-57; Plaintiff's Opposing SMF ¶¶ 56-57. They accordingly did not arrogate to shareholders willing to provide guaranties more than they had been willing to offer a third-party investor.

The plaintiff finally takes the defendants to task for not even thinking of endeavoring to quantify the risk entailed in guarantying the initial ASB financing; in the absence of such an effort, he contends, the defendants could not possibly have had any idea of the value of their guaranties. *See* Plaintiff's Opposition at 12-20. He makes a vigorous, but ultimately unpersuasive, case.

70

The plaintiff underscores that the defendants guarantied only secured debt, that is, debt secured by liens against all of WMI's real and personal property. *See id.* at 14; *see also* Plaintiff's Additional SMF ¶¶ 142-43; Defendants' Reply SMF ¶¶ 142-43. He posits, therefore, that "[t]he correct metric – one which was inarguably not utilized (or even thought about) by the Defendants – was whether, in a liquidation scenario, there were sufficient corporate assets to satisfy all of the *secured* debt that was to be guaranteed by the Defendants." *Id.* at 12 (footnote omitted) (emphasis in original). He argues that even a cursory review of the same financial data that was available to the defendants reveals that, at all relevant times, by several different measures, the value of WMI's assets comfortably exceeded the total amount of its guarantied debt. *See id.* at 14-16. He reasons that it should have been apparent to the defendants that there was no realistic risk at any time, either in late 2004 or throughout 2005, that (i) the value of WMI's assets would be insufficient to satisfy the guarantied liabilities or (ii) the guaranties would be called. *See id.* at 15-16 & n.14.

Nonetheless, as the defendants point out, the plaintiff (i) offers only the representation of counsel as to the "correct" methodology of determining the risk of personal guaranties, (ii) overlooks the fact that the personal guaranties obligated the defendants to pay ASB's attorney fees and other costs of collection, *see, e.g.,* Defendants' Reply SMF ¶ 147; Bader Reply Aff. ¶ 4; Unlimited Guaranty, Exh. 1 thereto, §§ 7.1-7.1.2, and (iii) assumes that WMI would have realized 100 percent of the book value of its assets in a forced liquidation despite the fact that neither set of figures set forth in its financial statements, those based on GAAP or those based on "estimated current value," is premised on the forced liquidation of WMI's assets. *See* Defendants' Reply at 4 & n.5.[88] He

---

[88] As the plaintiff notes, the "estimated current value" of machinery and equipment does in fact derive from a forced-liquidation value appraisal. *See* Plaintiff's Additional SMF ¶ 136; 2004 Financial Statements at [12]; 2005 Financial Statements at 12. Nonetheless, real estate was not valued at forced-liquidation prices, *see* Plaintiff's Additional SMF ¶ 137; 2004 Financial Statements at [12]; 2005 Financial Statements at 12, and Purdy Powers states that estimated current

accordingly falls short of making a persuasive case that the defendants overlooked information reasonably available to them that should have made clear to them that they suffered little to no risk of personal liability on account of the provision of guaranties (as a result of which, in his view, the guaranties had little to no value to the company).[89]

The plaintiff finally suggests that the defendants displayed lack of due care in connection with the Initial Guaranty Shares transaction when they failed to take into consideration new, material information that he argues should have led to reconsideration of the Guaranty Shares Formula before the initial tranche of shares issued in January 2006. *See* Plaintiff's Opposition at 11. Specifically, he faults the defendants for (i) omitting to factor in a report in the 2004 Financial Statements, which became available in April 2005, that the company was worth $970,100 as of year-end 2004 on an estimated-current-value basis, and (ii) failing to await receipt of either the 2005 Financial Statements, which became available about a week after the January 19, 2006 Board vote, or the Purdy Powers Appraisal. *See* Plaintiff's Motion at 19-20 & n.10. He also argues that ASB's willingness to lend to WMI and its bullish comments were "a clear indicator that this was not a company that was teetering on the edge of oblivion[.]" *Id*. at 19.

Nonetheless, reasonable people could disagree about the picture painted by the 2004 Financial Statements. The company's accounting firm expressly stated that the estimated-current-value figure was not reliable, was subject to significant imprecision, and did "not purport to present the net realizable, liquidation or market value of the Company." Defendants' SMF ¶ 43; Plaintiff's Opposing SMF ¶ 43. In addition, consistent with the defendants' conclusion when devising the

---

value does not purport to represent the liquidation value of the company as a whole, *see, e.g*., Defendants' SMF ¶ 115; 2004 Financial Statements at [12]; 2005 Financial Statements at 12.

[89] What is more, it is not self-evident that the risk of guaranties to guarantors is the only, or correct, measure of the value to a corporation of the provision of such guaranties.

Guaranty Shares Formula that WMI had a negative liquidation value, the 2004 Financial Statements set a value of the company at year-end 2004, pursuant to GAAP, of negative $413,415.  *See id.*

The plaintiff cites no authority for the proposition that the defendants (who delayed issuance of shares for several months in response to his complaint that he had insufficient time to consider whether to participate, *see id.* ¶¶ 83, 92) were obliged to await the results of the not-yet-issued 2005 Financial Statements and Purdy Powers Appraisal.  Those materials were not "reasonably available" to them at the time of the closing of the 2005 ASB Refinancing in August 2005, the October 2005 Board vote to issue the Initial Guaranty Shares, or even the January 19, 2006 Board vote ratifying issuance of those shares.  *See, e.g., Brehm*, 746 A.2d at 259.  Indeed, the Purdy Powers Appraisal was not published until the summer of 2006.  *See* Defendants' SMF ¶ 111; Plaintiff's Opposing SMF ¶ 111.

Finally, there is no reason to think that ASB's willingness to lend to WMI, or even its bullish comments, should have sent a red flag to the defendants that their assessment of the company's value was suspect.  ASB's statements did not reflect its evaluation of WMI's financial condition prior to the 2005 ASB Refinancing or a determination that WMI was fiscally sound prior thereto; rather, they were based on ASB's assessment of WMI's potential for increased sales in the event it was able to obtain better access to working capital.  *See* Defendants' Additional SMF ¶¶ 134-35; Plaintiff's Reply SMF ¶¶ 134-35.

In short, no material dispute of fact forestalls the conclusion that the defendants followed a rational process in the difficult circumstances presented in 2005 and considered material information reasonably available to them in devising the Guaranty Shares Formula and implementing it with respect to the Initial Guaranty Shares.  The defendants accordingly did not breach the duty of due care in connection with that transaction.  *See, e.g., Brehm*, 746 A.2d at 264 ("As for the plaintiffs'

contention that the directors failed to exercise 'substantive due care,' we should note that such a concept is foreign to the business judgment rule.  Courts do not measure, weigh or quantify directors' judgments.  We do not even decide if they are reasonable in this context.  Due care in the decisionmaking context is *process* due care only.") (footnote omitted) (emphasis in original).

### c.  Duty of Good Faith

Turning to the duty of good faith, the defendants assert that (i) a director cannot be held liable for breach of that duty absent actual or constructive fraud, (ii) there is no evidence of actual fraud on their part, (iii) while constructive fraud is shown when a stock price is grossly inadequate, pursuant to Del. Code Ann. tit. 8, § 152, a board of directors' determination as to the value of non-cash consideration paid for stock is conclusive "in the absence of actual fraud," and (iv) in any event, the plaintiff cannot prove constructive fraud inasmuch as he has no relevant, admissible evidence concerning the value of WMI's shares as of the time the Board made pertinent decisions relating to the Guaranty Shares Formula in March and August 2005.  *See* Defendants' Motion at 21-23.

The plaintiff rejoins that (i) the protections of Del. Code Ann. tit. 8, § 152 are unavailable to the defendants, who were personally interested in the transaction underlying the valuation and failed to place a value on the property or item exchanged for the shares, and (ii) he demonstrates constructive fraud via the defendants' complete failure to attempt to assess the value of their guaranties coupled with their cluelessness as to the value of the company's stock.  *See* Plaintiff's Opposition at 26-28.  He adds that the defendants' failure to fix the value of their guaranties, coupled with their cluelessness as to stock value, constituted bad faith in the form of "intentional dereliction of duty, a conscious disregard for one's responsibilities[.]"  *Id*. at 26.

Even assuming *arguendo* that the plaintiff is correct that the defendants cannot avail themselves of the protections of Del. Code Ann. tit. 8, § 152, he cannot demonstrate constructive fraud in connection with the Initial Guaranty Shares transaction.  He proffers no evidence of the value of WMI's shares at any possibly relevant point (March 2005, when the Guaranty Shares Formula was devised; October 2005, when the defendants provided personal guaranties in connection with the closing of the 2005 ASB Refinancing; or January 2006, when the Initial Guaranty Shares were issued).  *See* Defendants' SMF ¶¶ 105, 107-09; Plaintiff's Opposing SMF ¶¶ 105, 107-09.  Thus, the plaintiff does not effectively controvert the defendants' evidence that, as of those times, WMI's shares were valueless.

The plaintiff's catchall contention that the defendants' manner of devising the Guaranty Shares Formula evidenced bad faith in the form of "intentional dereliction of duty" or "conscious disregard for one's responsibilities" likewise is unavailing.  As discussed above, the cognizable evidence makes clear that the defendants exercised due care in devising the formula and applying it in connection with the 2005 ASB Refinancing.  In any event, the Delaware Supreme Court has signaled that lack of due care, standing alone, does not amount to bad faith.  *See Disney V*, 906 A.2d at 64-65 ("[T]o afford guidance we address the issue of whether gross negligence (including a failure to inform one's self of available material facts), without more, can also constitute bad faith.  The answer is clearly no.").

For the foregoing reasons, the defendants demonstrate that they did not breach their fiduciary duties of loyalty, due care, or good faith with respect to issuance of the Initial Guaranty Shares and that they therefore are entitled to the protections of the business judgment rule with respect to that transaction.  The defendants had a rational business purpose for issuance of the shares in question: to obtain the personal guaranties necessary to close on a refinancing deal favorable to the corporation.

Therefore, they are entitled to summary judgment with respect to issuance of the Initial Guaranty Shares.

## 2. Issuance of Additional Guaranty Shares

The plaintiff finally seeks summary judgment as to liability and damages with respect to issuance of the Additional Guaranty Shares. *See* Plaintiff's Motion at 2-30. As in the case of the Initial Guaranty Shares, he argues that the business judgment rule was inapplicable *ab initio* by virtue of the defendants' alleged self-dealing. Alternatively, he contends that he has rebutted the presumption of its application by a showing of breaches of the duties of loyalty, care, and/or good faith. *See id.* at 3-4.

### a. Duty of Loyalty

The plaintiff's argument that the defendants engaged in self-dealing with respect to the Additional Guaranty Shares mirrors that made with respect to the Initial Guaranty Shares. *See id.* at 5-11. It is rejected for the same reasons.

### b. Duty of Due Care

As concerns the second tranche of guaranty shares, the plaintiff contends that the defendants were grossly negligent both in the manner in which they crafted the Guaranty Shares Formula in March 2005 and in failing to reconsider the formula in light of new, material information available to them prior to January 2007. *See id.* at 12-22. I have already determined that no reasonable fact-finder could discern gross negligence in the defendants' crafting of the Guaranty Shares Formula in March 2005.

The plaintiff is correct, however, that, by January 2007, the defendants had available to them material new information illuminating the value of WMI in the form of the Purdy Powers Appraisal, released in June 2006, which set the fair market value of 100 percent of the common equity interest of WMI as of December 31, 2005 at $2,470,000.  *See* Defendants' SMF ¶ 111; Plaintiff's Opposing SMF ¶ 111; Plaintiff's SMF ¶¶ 61, 109; Defendants' Opposing SMF ¶¶ 61, 109.[90]  From all that appears, prior to issuance of the Additional Guaranty Shares in January 2007, none of the defendants gave the slightest thought to reconsidering the March 2005 Guaranty Shares Formula in the light of that significant new valuation information.  This was indeed grossly negligent, a violation of the duty of due care.  *See, e.g., Cede II*, 634 A.2d at 371 ("Cinerama clearly met its burden of proof for the purpose of rebutting the rule's presumption by showing that the defendant directors of Technicolor failed to inform themselves fully concerning all material information reasonably available prior to approving the merger agreement.").  The defendants accordingly are obliged to prove the entire fairness of the Additional Guaranty Shares transaction.  *See, e.g., id.*[91]

### c.  Duty of Good Faith

---

[90] The defendants also had available to them, by the time of the second guaranty-shares transaction, the 2005 Financial Statements, released on or about January 25, 2006.  *See* Plaintiff's SMF ¶ 96; 2005 Financial Statements at 1.  However, the parties dispute the significance of this document, with the plaintiff pointing out that it placed WMI's value at $1,441,500 as of December 31, 2005 on an estimated-current-value basis and the defendants noting that it showed WMI's liabilities exceeding the value of its assets by $293,206 as of then on a GAAP basis.  *Compare* Plaintiff's SMF ¶ 96; 2005 Financial Statements at 3 *with* Defendants' Opposing SMF ¶ 96; 2005 Financial Statements at 3.

[91] The defendants all but concede that the plaintiff establishes a breach of due care in connection with the 2007 transaction (thereby shifting the burden to them to demonstrate its entire fairness).  The only argument they muster in opposition to the plaintiff's position on due care is that, to the extent it has any merit, he is not entitled to summary judgment because their expert, Gurley, can establish at trial that the plaintiff suffered no real damages.  *See* Defendants' Opposition at 22.  However, a plaintiff is not required to prove injury emanating from a breach of the duty of due care to rebut the presumption of application of the business judgment rule.  *See, e.g., Cede II*, 634 A.2d at 369 ("[T]his Court has never interposed, for purposes of the [business judgment] rule's rebuttal, a requirement that a shareholder asserting a claim of director breach of duty of care (*or* duty of loyalty) must prove not only a breach of such duty, but that an injury has resulted from the breach *and* quantify that injury at that juncture of the case. . . .  Requiring a plaintiff to show injury through unfair price would effectively relieve director defendants found to have breached their duty of care of establishing the entire fairness of a challenged transaction.") (emphasis in original).

The plaintiff makes no argument in favor of summary judgment as to breach of the duty of good faith apart from those discussed, above, in the context of breach of the duty of due care. *See* Plaintiff's Motion at 12-22; *see also id.* at 21 ("The conscious ignoring of important and reliable information about value constitutes bad faith"). Gross negligence alone does not amount to bad faith. *See Disney V*, 906 A.2d at 64-65 ("[T]o afford guidance we address the issue of whether gross negligence (including a failure to inform one's self of available material facts), without more, can also constitute bad faith. The answer is clearly no."). The plaintiff thus falls short of showing breach of the duty of good faith in connection with the 2007 tranche of guaranty shares.

### d. Entire Fairness

The defendants contend that, in a scenario in which they are obliged to prove the entire fairness of the disputed transactions, disputes of material fact preclude summary judgment in their opponent's favor. *See* Defendants' Opposition at 23-29. However, the exclusion of Gurley's testimony regarding the value of the guaranties that the defendants provided in connection with the 2007 ASB Financing is fatal to their ability to prove fair price. That, in turn, is fatal to their ability to prove the entire fairness of the challenged 2007 transaction. *See, e.g., Weinberger*, 457 A.2d at 711. The plaintiff accordingly is entitled to summary judgment as to liability with respect to the issuance of the Additional Guaranty Shares.

### e. Damages

The plaintiff predicated his bid for summary judgment as to damages on (i) grant of his motion to exclude Gurley's testimony as to the value of WMI or (ii) Gurley's correction of his opinion to align with that of the plaintiff. *See* Plaintiff's Motion at 29-30. Inasmuch as (i) the court declined to strike Gurley's testimony as to WMI's value, *see* Exclusion Decision at 10, (ii) Gurley corrected his valuation, but it still does not align precisely with that of the plaintiff, *compare*

Plaintiff's SMF ¶ 130; Filler Designation at 1 *with* Defendants' Opposing SMF ¶ 130; Gurley Aff. ¶¶ 14-15, and (iii) the plaintiff's damages figure presupposes liability with respect to issuance of both sets of guaranty shares, *see* Plaintiff's SMF ¶ 131, but I have recommended summary judgment in the defendants' favor as to the first set, his bid for summary judgment as to damages should be denied.

### III.  Conclusion

For the foregoing reasons, I **GRANT** the plaintiff's motion to exclude testimony of the defendants' expert, Gurley, insofar as it concerns Gurley's valuation of personal guaranties given by the defendants in 2005 and 2007, and recommend that the court **GRANT** the defendants' motion for partial summary judgment as to the issuance of the Initial Guaranty Shares, **GRANT** the plaintiff's motion for summary judgment as to liability with respect to issuance of the Additional Guaranty Shares, and otherwise **DENY** the plaintiff's motion for summary judgment.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 23rd day of July, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge